[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16482

_____

D.C. Docket No. 6:15-cr-00226-CEM-GJK-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DANE GILLIS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 13, 2019)

Before JILL PRYOR, ANDERSON, and HULL, Circuit Judges.

PER CURIAM:

After a jury trial, Defendant Dane Gillis appeals his convictions for:

(1) attempting to knowingly induce or entice a minor to engage in sexual activity,

in violation of 18 U.S.C. § 2422(b) (Count 1); (2) solicitation of another to commit the crime of federal kidnapping under 18 U.S.C. § 1201(a), in violation of 18 U.S.C. § 373 (Count 2); and (3) knowingly transmitting a communication containing a threat to kidnap, in violation of 18 U.S.C. § 875(c) (Count 3).  On appeal, Gillis argues that (1) the government failed to present sufficient evidence to support his § 2422(b) conviction in Count 1, and (2) the district court deprived him of his constitutional right to present a defense by prohibiting the testimony of his proposed expert witnesses.  Gillis also contends that his § 373 solicitation conviction in Count 2 must be vacated because § 1201(a) kidnapping does not categorically satisfy the use-of-force element in § 373.

After careful review of the record and the parties' briefs, and with the benefit of oral argument, we affirm in part and reverse in part.  We first recount the evidence and procedural history in this case.

## I.  TRIAL EVIDENCE

The three charges arose from Gillis's online communications with an undercover agent from September 1-16, 2015.  These communications involved two separate intended victims: (1) M.O., Gillis's coworker; and (2) the undercover agent's fictional 11-year-old daughter.

In late August 2015, Gillis posted an ad on the Orlando, Florida, "personals" section of the website Craigslist under the "casual encounters" subsection.  The ad

stated: "Looking for a guy or a group who [are] into extremely taboo scenes.  Hi risk and reward for the right sadistic Pervert."

On September 1, 2015, Gillis's ad caught the attention of Special Agent Rodney Hyre, with the Federal Bureau of Investigation's ("FBI") Violent Crimes Against Children Task Force.  Agent Hyre was reviewing ads on Craigslist to identify individuals who might be soliciting sexual activity with children.  Posing undercover as the father of an 11-year-old girl, Agent Hyre replied to Gillis's ad.  Agent Hyre identified himself as a "40 yo[] dad perv with 11 yo daughter" who was interested in meeting "like minding people."

Shortly thereafter, Gillis, who at the time was 58 years old, responded, "Tell me more . . . i know a 40 yo that needs to be schooled."  Gillis then sent Agent Hyre a picture of victim M.O. and asked "Any pics?"  In response, Agent Hyre sent Gillis a photograph of his supposed daughter (actually a childhood photograph of a fellow law enforcement officer), with the message "sweet for 11. don't you think."  Over the next two and a half weeks, Gillis and Agent Hyre carried on a conversation in which they discussed (1) a plan to kidnap and rape Gillis's coworker M.O., and (2) a plan for Gillis to meet and engage in sexual activity with Agent Hyre's fictional 11-year-old daughter.

Regarding the kidnapping plan, Gillis told Agent Hyre that he was "looking to snag [M.O.] and use her a[s] a sex slave."  During the course of the

3

conversation, Gillis sent Hyre three more pictures of M.O. and explained that M.O. was his coworker, that she was "unwilling and unknowing," and that kidnapping her would require "some strategic planning . . . manpower etc."

Gillis stated that the kidnapping would have to take place early in the morning, around 4:30 a.m., because of his and M.O.'s respective work schedules. Gillis asked Agent Hyre if he had any friends, specifically "someone with experience," that would be interested in assisting with the kidnapping plot. Gillis explained that they would "[n]eed help," "a van," and "a place to keep [M.O.] for at least 24 hours," and recommended that they "hood and[/]or blindfold her" and wear masks themselves. Gillis described the types of sexual acts he wanted to perform on M.O. and described her as "a goody 2 shoes flirt that NEEDS to be taught a lesson." Gillis told Agent Hyre that he was "open to any 'ending' scenario when it [comes] to her."

Regarding the minor daughter, Gillis told Agent Hyre early on in the conversation that he would "love to meet [Agent Hyre's] girl" and asked when he could meet her. At one point during the conversation, Agent Hyre asked Gillis for clarification about whether Gillis was "interested in my 11 yo girl or just older," to which Gillis responded, "Right now im only interested in your 11 yo . . . the other we can talk about." As their plans to meet progressed, Gillis asked Agent Hyre what types of sexual acts the daughter would be willing to perform. When Agent

4

Hyre told Gillis that "[s]he will do whatever you say" and asked what Gillis would like to do to the girl, Gillis told Hyre that he would like to do "a little of everything," including oral sex and vaginal penetration.

Gillis and Hyre initially planned to meet on September 10, 2015, but Gillis backed out at the last minute. The following day, Agent Hyre reached out to Gillis again, and they resumed discussions about both the plan to kidnap M.O. and the plan for Gillis to have sex with Agent Hyre's fictional daughter. Gillis explained that he backed out of the first meeting with Agent Hyre and the daughter because he was "a little nervous," having "[n]ever been with a young one" before, and was concerned that Agent Hyre might be setting him up. Agent Hyre reassured Gillis that he was not being set up, and they then planned a second rendezvous in which Gillis and Agent Hyre would meet first to "show we are real" and then Agent Hyre would take Gillis back to his house to meet the fictional daughter.

As they were planning this second meeting, Gillis asked Agent Hyre seven times for more pictures of the daughter and requested that Agent Hyre dress her in "a short skirt no underwear" for their meeting. When Agent Hyre sent Gillis a second picture, Gillis commented: "Looks [like] she has some tasty little titties . . . is she still all smooth down below?" Ultimately, they arranged to meet at a Gander Mountain parking lot in Lake Mary, Florida—about an hour's drive from Gillis's home in Leesburg, Florida—on September 16, 2015.

5

On the day of this second planned meeting, Gillis drove to the Gander Mountain parking lot in Lake Mary.  Another FBI agent posed as the 11-year-old's father and waited in a tan Buick, while Agent Hyre and a third agent conducted surveillance from the other side of the parking lot.  Gillis flashed his headlights, and the agent posing as the father tapped his brake lights.  After approaching Gillis's car and confirming his identity, the agent asked him, "Do you want to go to the house?" and Gillis answered, "Sure."  The agents then arrested Gillis and advised him of his constitutional rights under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).  Gillis waived his rights and agreed to talk to the agents.

In a post-Miranda interview, Gillis admitted: (1) that he had been emailing with the father of an 11-year-old girl; (2) that those conversations centered on his having sex with the daughter; and (3) that he had driven an hour from Leesburg for no other reason than to "have sex with the little girl."  Gillis admitted that "for approximately the last two years" he had "fantasized about having sex with children."  A subsequent search of Gillis's computer revealed sexually suggestive photographs of prepubescent girls and his internet search history showed that, since 2011, Gillis repeatedly sought out pornographic images of preteen girls.

Regarding the plot to kidnap M.O., Gillis first told agents during his post-Miranda interview that her name was Jamie Johnson and gave a detailed story about how she had broken his heart.  Gillis admitted he had been posting on

6

Craigslist for the past couple of years and had 10 to 20 conversations with people about helping him to kidnap and hurt Jamie Johnson. When the agents confronted Gillis with the victim's true name, Gillis admitted that M.O. was the person he had been sending pictures of and "talking about kidnapping and raping and possibly killing." Gillis explained that they were coworkers but had no romantic relationship. Gillis admitted that, two weeks prior, M.O. had rejected him and told him she was leaving the restaurant where they worked together and going to work at another restaurant.

Further investigation revealed that Gillis had been trying for months to find someone to help him kidnap and rape M.O. Between February and August 2015, without M.O.'s knowledge, Gillis engaged in sexually explicit communications about kidnapping and raping M.O. and sent photographs of M.O. to numerous Craigslist users. Additionally, around the time he was messaging Agent Hyre in September 2015, Gillis conducted several internet searches containing the words "rape" and "kidnap."

## II.  PROCEDURAL HISTORY

In a superseding indictment, a federal grand jury charged Gillis with:
(1) attempting to knowingly induce or entice a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b) (Count 1); (2) solicitation of another to commit the crime of federal kidnapping under 18 U.S.C. § 1201(a), in violation of 18

7

U.S.C. § 373 (Count 2); and (3) knowingly transmitting a communication containing a threat to kidnap, in violation of 18 U.S.C. § 875(c) (Count 3). Gillis pled not guilty and the case proceeded to a jury trial.

At trial, the government presented evidence and testimony detailing the facts outlined above. Gillis then presented several witnesses and testified in his own defense. Generally speaking, Gillis testified that his entire online conversation with Agent Hyre was merely role-playing and fantasy, and he never actually intended to do any of the acts he described with respect to either M.O. or the fictional 11-year-old. Although the district court ruled that Dr. James Herriot, Gillis's expert witness, could testify about internet communication generally, Gillis ultimately chose not to call him at trial.

The jury found Gillis guilty on all three counts. The district court sentenced him to 365 months imprisonment on Count 1, 240 months on Count 2, and 60 months on Count 3, all to run concurrently.[1]

### III. SUFFICIENCY OF THE EVIDENCE

On appeal, Gillis challenges the sufficiency of the evidence to support his § 2422(b) conviction in Count 1 for attempting to induce or entice a minor to engage in sexual activity.[2] Gillis argues, among other things, that: (1) his

---

[1]Gillis does not raise any sentencing issues on appeal.

[2]We review challenges to the sufficiency of the evidence supporting a conviction de novo, viewing the evidence and making all reasonable inferences therefrom in the light most

Craigslist advertisement itself evidenced no intent to induce a minor to engage in sexual activity; (2) Agent Hyre introduced the notion of sex with a minor into the conversation; (3) Gillis abandoned the first planned meeting with the minor, demonstrating an abandonment of any intent to engage in sexual activity with the minor; and (4) in setting up the second meeting, Gillis only sought to meet with the father of the fictional minor to "discuss the possibility of future illicit activity."

Section 2422(b) proscribes knowing attempts to induce or entice a minor to engage in sexual activity, stating:

> Whoever, using the mail or any facility or means of interstate or foreign commerce, . . . knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life.

18 U.S.C. § 2422(b).  To prove that a defendant violated § 2422(b) by attempting to induce a minor to engage in sexual activity, the government must show that the defendant (1) had the specific intent to induce a minor to engage in sexual activity, and (2) took a substantial step toward the commission of that offense.  United States v. Lee, 603 F.3d 904, 913-14 (11th Cir. 2010); United States v. Yost, 479 F.3d 815, 819 (11th Cir. 2007).  This Court has held that a defendant may be

---

favorable to the jury's verdict.  United States v. White, 663 F.3d 1207, 1213 (11th Cir. 2011). We will reverse a guilty verdict only if "no trier of fact could have found guilt beyond a reasonable doubt."  Id. (quotation marks omitted).

9

convicted under § 2422(b) even if he attempted to exploit only a fictitious minor and communicated only with an adult intermediary.  See Lee, 603 F.3d at 912-13; see also United States v. Murrell, 368 F.3d 1283, 1286-87 (11th Cir. 2004).

Ample evidence supports Gillis's conviction on Count 1.  At trial, the evidence showed that Gillis engaged in a two-week online conversation with a person he believed to be the parent of a minor daughter, during which he discussed in detail plans to meet and engage in sexual activity with the daughter.  Though Gillis is correct that Agent Hyre initiated discussion of the fictional minor, Gillis's responses as the conversation progressed demonstrated his sexual interest in the daughter and intent to induce the daughter, through her father, to engage in sexual activity.

Furthermore, Gillis cancelled the first meeting because he was "nervous" and feared he was being set up, not because he was no longer interested in engaging in sexual activity with the minor daughter.  Indeed, Gillis's subsequent comments to Agent Hyre in planning the second meeting show he remained interested in engaging in sexual activity with the daughter and anticipated doing so after first meeting the father.  And Gillis took a substantial step toward consummating that plan when he drove nearly an hour from his home to Lake Mary for that meeting.  See Murrell, 368 F.3d at 1288 (defendant's two-hour travel to meet a minor for sex was corroborative of criminal intent).

10

Other evidence corroborated Gillis's intent, including (1) Gillis's admission, during his post-<u>Miranda</u> interview, that he traveled to the Gander Mountain parking lot for the purpose of engaging in sex with a minor, (2) Gillis requested that the minor daughter be wearing a particular outfit without underwear, and (3) the wealth of prepubescent images and search terms found on Gillis's computer. Although Gillis testified that Agent Hyre's account of the post-<u>Miranda</u> interview was inaccurate and that he had no sexual interest in children, the jury was free to disbelieve that testimony and consider it as substantive evidence of his guilt. <u>United States v. Bacon</u>, 598 F.3d 772, 776 (11th Cir. 2010).

For all of these reasons, we conclude that sufficient evidence supported Gillis's § 2242(b) conviction in Count 1.

## IV.  EXPERT WITNESSES

Even if the evidence was sufficient, Gillis alternatively contends that the district court deprived him of his Fifth and Sixth Amendment rights to present a defense on all three counts (1) by limiting the testimony of Dr. Herriot, his expert witness, and (2) by prohibiting Dr. Susan Sullivan, his other expert, from testifying at all. In order to review this claim, we outline the pretrial proffers about the testimony of these two expert witnesses and the district court's rulings thereon.

Prior to trial, Gillis disclosed James W. Herriot, Ph.D., a sexologist, and Susan Sullivan, Ph.D., a clinical psychologist, as proposed experts on sexual

11

communication and behavior on the internet and Gillis's own psychosexual

makeup, respectively.  In separate motions, the government moved to exclude both

experts' testimony, and the district court held hearings on both motions.

## A.    <u>Daubert</u> Hearing as to Dr. Herriot's Testimony

At the <u>Daubert</u>[3] hearing, Dr. Herriot testified that he had an undergraduate

degree in computer science from Stanford University and that he earned his Ph.D.

from the Institute for Advanced Study of Human Sexuality ("IASHS") in 1996 and

had been on the faculty at IASHS ever since.  Dr. Herriot stated that he was a

member of the American College of Sexologists and was certified as a sexologist

through that organization.  Dr. Herriot explained that he wrote his Ph.D.

dissertation on sexual communication on the internet.  As part of his research,

Dr. Herriot "analyzed about 20 million keystrokes worth of communication" on

"interactive or nearly interactive forum, like sexual material."

Dr. Herriot testified that since his dissertation, he had done additional

research regarding sexual communications on the internet and had also "kept up

with the field."  Regarding this additional research, Dr. Herriot stated that he had

conducted "about 100" interviews related to sexual communications on the

internet.  Dr. Herriot opined that there is "much that goes on in sexual

communication [on the internet] that's not obvious at first glance," and

---

[3]<u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 113 S. Ct. 2786 (1993).

understanding such communications can be counterintuitive. According to Dr. Herriot, "[t]here's a kind of space between what goes on in our minds and what we actually do in real life," and the internet "opens up an in-between space" where people engage in fantasy role playing that involves "a combination of fact and fiction." Dr. Herriot further explained that the internet creates a phenomenon called the "online disinhibition effect," in which a person's "identity becomes decoupled from their . . . online behavior" and they behave differently online than they would in the real world.

When asked about Gillis specifically, Dr. Herriot stated that he could not "divine or know anything about [Gillis's] motivation" in this case because he is not a psychologist, but could "say . . . something about the overall context" of online communications. On cross-examination, Dr. Herriot admitted that: (1) his dissertation had never been published in an academic journal; (2) his study was based predominantly on internet message-board postings that did not involve real-time communication between users; and (3) his paper did not discuss the topic of role playing on the internet. Dr. Herriot stated that he later expanded his research to chat rooms and instant messaging as well, but never published any of his results. Dr. Herriot also admitted that, although he was a "professor" at IASHS, he did not teach any classes there, had not published any articles on human sexuality, and was merely a resource for doctoral students.

13

Following the hearing, the district court issued a written order granting in part the government's motion to exclude Dr. Herriot's testimony. The district court noted that Gillis sought to introduce Dr. Herriot's testimony on two separate, but related, topics: (1) "how the internet works and how people are able to communicate and socialize on the internet" and (2) "the internet sub-culture for fantasy role-playing and sexual communications." As to the first topic, general discussion of the internet and communication, the district court found that Dr. Herriot was qualified to testify as an expert and that his testimony was reliable and relevant. The district court therefore permitted Gillis to offer Dr. Herriot's testimony on this topic.

As to the second topic, fantasy role playing and sexual communications online, the district court found that Gillis failed to disclose more than "an overview of the general genre of testimony that Dr. Herriot will offer and assurances that Dr. Herriot has opinions pertinent to that category of inquiry." The district court further found that although Dr. Herriot based his expertise on social science research and experience, he "provided little information in regards to the interviews and studies he conducted," and his studies were not randomized or peer reviewed and occurred nearly two decades ago. Similarly, to the extent that Dr. Herriot purported to rely on "academic literature," he failed to identify those sources, and the district court was unable to assess their credibility. In addition,

14

Dr. Herriot did not specify any single opinion he intended to introduce at trial, and the general proposition he intended to offer—that some information people communicate anonymously over the internet is false—was within the common knowledge of laypersons. The district court therefore precluded Dr. Herriot from testifying on the topic of fantasy role playing and sexual communications online.

## B.    Later Hearing as to Dr. Sullivan's Testimony

Gillis represented that Dr. Sullivan had "performed a psychosexual evaluation" of Gillis and would testify about her opinions on Gillis's "psychosexual makeup" and "sexual development." During the hearing, defense counsel provided copies of Dr. Sullivan's expert report to the government and the district court. However, it does not appear that the report itself was made a part of the district court record. Though Dr. Sullivan apparently was available, she did not testify at the hearing. Accordingly, we have few details regarding the contents of Dr. Sullivan's proposed testimony, other than that she would testify about Gillis's "psychosexual makeup" and "sexual development."

At the hearing regarding Dr. Sullivan's proposed testimony, the government argued that Gillis's disclosure of Dr. Sullivan was untimely and inadequate. The district court expressed concern that Dr. Sullivan's proposed testimony was based solely on her clinical interview with Gillis and would essentially allow Gillis to testify through self-serving hearsay without his being subject to cross-examination.

15

Gillis responded that, in addition to interviewing him, Dr. Sullivan had also performed several widely accepted psychological tests. Gillis also proffered that Dr. Sullivan would testify, based on her evaluation, that Gillis "doesn't have an interest in prepubescent children." The district court took the government's motion to exclude Dr. Sullivan's testimony under advisement and allowed the parties to file supplemental briefing on the issue.

On the first day of trial, the district court granted the government's motion to exclude Dr. Sullivan's testimony. The district court concluded that Dr. Sullivan would simply be "relaying what [the] defendant told her," and that the true purpose of her proposed testimony was to "present opinion testimony from an expert concluding that the defendant did not have the requisite intent to commit the [enticement] offense" in Count 1 because he was not attracted to prepubescent girls.

## C.    Analysis

Gillis does not argue that the district court abused its discretion in excluding Dr. Sullivan's testimony and part of Dr. Herriot's testimony under the Federal Rules of Evidence and Daubert. Rather, Gillis asserts that, even if technically inadmissible under the rules governing expert testimony, the experts' testimony should have been admitted because it was necessary to negate the subjective intent element of all three charged offenses and to rebut the Federal Rule of Evidence

16

404(b) evidence of his internet search history.  Gillis submits that the excluded

expert testimony would have placed in context his online communications and

shown he was engaging in fantasy role play and had no intent to do these crimes.

By not allowing him to present that expert testimony, Gillis contends that the

district court deprived him of his constitutional right to present a defense.

The Constitution grants criminal defendants the implicit right to present

evidence in their favor.  United States v. Hurn, 368 F.3d 1359, 1362 (11th Cir.

2004) (citing U.S. Const. amends. V & VI).  In evaluating a defendant's claim that

his constitutional right to present a defense was violated, we examine (1) whether

the right was actually violated, and (2) if so, whether that error was harmless

beyond a reasonable doubt.  Id. at 1362-63.

Among other things, a defendant "must generally be permitted to introduce

evidence directly pertaining to any of the actual elements of the charged offense,"

as well as evidence that "could make the existence of one or more of the elements

of the charged offense . . . more or less certain."  Id. at 1363.  Notably, this general

principle does not give the defendant an "unfettered right to offer testimony that is

incompetent, privileged, or otherwise inadmissible under standard rules of

evidence."  Taylor v. Illinois, 484 U.S. 400, 410, 108 S. Ct. 646, 653 (1988).  But,

"the fact that a particular rule of evidence requires the exclusion of certain

evidence is not dispositive, as particular applications of a generally valid rule may

17

unconstitutionally deny a defendant his rights under the Compulsory Process or Due Process Clauses." Hurn, 368 F.3d at 1363 n.2.

Although Gillis does not challenge the district court's exclusion of his experts' testimony under the Rules of Evidence or Daubert, whether that ruling was correct is relevant to whether Gillis's constitutional right to present a defense was violated. Accordingly, we address whether the district court abused its discretion in excluding the testimony of Gillis's experts before determining whether that exclusion violated Gillis's constitutional rights.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Fed. R. Evid. 702; United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

18

Fed. R. Evid. 702. In determining whether to admit expert testimony under Rule 702, district courts must consider if: (1) the expert is qualified to give competent testimony about the matters he intends to address; (2) the methodology the expert employed to reach his conclusions is sufficiently reliable under Daubert; and (3) the testimony will assist the trier of fact, through the application of scientific, technical, or other specialized expertise, to understand the evidence or determine a fact in issue. City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998).

In Daubert, the Supreme Court explained that a district court faced with a proffer of expert testimony must assess whether the reasoning or methodology underlying the testimony is scientifically valid and can properly be applied to the facts in issue. Daubert, 509 U.S. at 592-93, 113 S. Ct. at 2796. Many factors may bear on that inquiry, including: (1) whether the theory or technique has been or can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential error rate; and (4) whether the theory or technique is widely accepted. Id. at 593-94, 113 S. Ct. at 2796-97. The Supreme Court emphasized that the Rule 702 inquiry is "a flexible one," the ultimate goal of which is to determine the evidentiary relevance and reliability of the proposed expert testimony. Id. at 594-95, 113 S. Ct. at 2797.

19

Even if an expert's proposed testimony satisfies Rule 702 and Daubert, the testimony must also comply with other limitations contained in the Rules of Evidence.  Of relevance here, Rule 704(b) provides:

> In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.  Those matters are for the trier of fact alone.

Fed.R.Evid. 704(b).  In other words, an expert may not opine on the defendant's intent.  See United States v. Augustin, 661 F.3d 1105, 1123 (11th Cir. 2011).  However, an expert may, consistent with Rule 704(b), give testimony "that supports an obvious inference with respect to the defendant's state of mind if that testimony does not actually state an opinion on [the] ultimate issue, and instead leaves this inference for the jury to draw."  Id. (internal quotations and alteration omitted).

Here, the district court did not abuse its discretion in excluding Dr. Herriot's and Dr. Sullivan's testimony under Daubert and the evidentiary rules governing expert testimony.[4]  As to Dr. Herriot, the district court thoroughly explained in its

---

[4]"We review for abuse of discretion the district court's decisions regarding the admissibility of expert testimony and the reliability of an expert opinion."  Frazier, 387 F.3d at 1258.  "Indeed, the deference that is the hallmark of abuse-of-discretion review requires that we not reverse an evidentiary decision of a district court unless the ruling is manifestly erroneous."  Id. (internal quotations and citation omitted).  "Thus, it is by now axiomatic that a district court enjoys considerable leeway in making these determinations."  Id. (internal quotations omitted).  "[W]e must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard."  Id. at 1259.

order why Dr. Herriot's proposed testimony about fantasy and role playing in online sexual communications did not satisfy Rule 702 and Daubert.  Among other things, the district court found that: (1) Dr. Herriot's research was conducted nearly 20 years ago using a different online medium; (2) his studies were not randomized, peer-reviewed, or published; (3) he was not able to specifically identify the academic literature on which he purported to base his opinions; (4) he did not demonstrate sufficient experience in the field of online sexual communications; and (5) his primary conclusion—that not all communications on the internet are truthful—was within the knowledge of laypersons.  Given these infirmities, we have no trouble concluding the district court properly excluded Dr. Herriot's proposed testimony about online sexual communications.  See Frazier, 387 F.3d at 1259; Harcros Chems., 158 F.3d at 562.

We likewise have little trouble concluding the district court did not abuse its discretion in excluding Dr. Sullivan's proposed testimony.  See Frazier, 387 F.3d at 1259.  The district court determined that Dr. Sullivan's proffered opinion that Gillis was not sexually attracted to prepubescent girls was simply a thinly veiled attempt by the defense to offer an expert opinion that Gillis lacked the requisite intent for the enticement offense in Count 1.  We see no clear error in the district court's determination that Dr. Sullivan's proffered testimony would do more than "leave[ an] inference for the jury to draw," and instead veered into the

21

impermissible territory of offering an opinion on Gillis's mental state.  See

Augustin, 661 F.3d at 1123 (internal quotation marks omitted); Fed. R. Evid.

704(b).

It is unsurprising, therefore, that Gillis does not contest the admissibility

aspect of the district court's rulings.  Accordingly, to show he was deprived of his

constitutional right to present a defense, Gillis must demonstrate a compelling

reason for making an exception to the expert witness rules in this case to allow the

two experts' testimony.  See Knight v. Dugger, 863 F.2d 705, 729 (11th Cir. 1988)

(explaining that a conviction may be reversed based on the exclusion of evidence

where there is either a clear error by the trial court in its evidentiary rulings or

"compelling reasons for exceptions" to the rules of evidence).  This he has not

done.  Given that the district court did not err in rejecting Dr. Herriot's and

Dr. Sullivan's testimony, the mere fact that their testimony would have been

helpful to Gillis's defense does not provide a compelling reason for admitting that

testimony despite its failure to satisfy Daubert and the rules of evidence.[5]  See id.

---

[5]Gillis makes much of the Second Circuit's decision in United States v. Joseph, 542 F.3d 13, 21 (2d Cir. 2008), abrogated in part on other grounds as recognized in United States v. Ferguson, 676 F.3d 260, 276 n.14 (2d Cir. 2011), in which that Court encouraged the district court to reconsider the defendant's request to present testimony from Dr. Herriot.  However, the district court in that case rejected Dr. Herriot's testimony primarily on relevancy grounds and not, as here, because it found his proposed testimony to be unreliable.  Id.  Furthermore, the Second Circuit stated that the reliability of testimony such as Dr. Herriot's "depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." Id.  In this case, the district court specifically found that Gillis failed to show Dr. Herriot had sufficient experience in the relevant subject matter to qualify him as an expert.

22

That is particularly so here, where Gillis chose to testify at trial and was able to present his fantasy role playing argument to the jury.

## V. 18 U.S.C. § 373 CONVICTION

Gillis challenges his Count 2 conviction for solicitation of another to commit the crime of federal kidnapping under 18 U.S.C. § 1201(a), in violation of 18 U.S.C. § 373.  Section § 373 provides that:

> [w]hoever, with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicits, commands, induces, or otherwise endeavors to persuade such other person to engage in such conduct, shall be imprisoned . . . .

18 U.S.C. § 373(a) (emphasis added).  To be convicted under § 373, the defendant (1) must solicit another person to "engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force," and (2) must solicit "such other person to engage in such conduct" under circumstances strongly corroborative of that intent.[6]  Id.

The actual, real-world conduct that Gillis solicited was a kidnapping by physical violence, including hooding, blindfolding, and snagging the victim M.O., putting her in a van, and then using her as a sex slave.  The actual conduct Gillis

---

[6]Although the § 373 statute is entitled "solicitation to commit a crime of violence," the text of the statute does not use the term "crime of violence."

23

solicited clearly "constitut[ed] a felony that ha[d] as an element the use . . . of physical force" against the victim.  18 U.S.C. § 373(a).  Nonetheless, Gillis contends § 373's elements text permits only the use of the categorical approach, which requires blindness to his actual conduct.  Gillis argues our panel has no choice in this matter because it is bound by our elements-clause precedent in United States v. McGuire, 706 F.3d 1333 (11th Cir. 2013).[7]

More specifically, Gillis contends that: (1) our McGuire precedent holds that the text of the elements clause in 18 U.S.C. § 924(c) requires that we apply the categorical approach; (2) the text of § 373 has an identical elements clause, which means McGuire requires the categorical approach here too; (3) the elements clause in § 373 modifies "felony," not "conduct"; (4) under the categorical approach, we must look to the least culpable acts by which § 1201(a) federal kidnapping can be committed; (5) the least culpable act of the § 1201(a) federal kidnapping Gillis solicited is "confinement"; and (6) kidnapping by confinement can be accomplished without the use, attempted use, or threatened use of physical force.[8] See Moncrieffe v. Holder, 569 U.S. 184, 190-91, 133 S. Ct. 1678, 1684 (2013).

---

[7] For discussion of McGuire's subsequent treatment see infra note 10.

[8] Notably, the § 1201(a) statute also prohibits kidnapping by "inveiglement" or "decoy." Although Gillis does not argue that those are the least culpable acts for purposes of his case we consider this legal question de novo.  See Splunge v. Shoney's, Inc., 97 F.3d 488, 492 n.2 (11th Cir. 1996) ("Stipulations to pure questions of law are of course not binding on courts." (citation omitted)).

24

The government disagrees and argues a conduct-based approach applies because: (1) the § 373 text twice refers to the "conduct" the defendant was soliciting someone to engage in; (2) even though the elements clause follows "felony," the § 373 text refers to "conduct constituting a felony," not "an offense that is a felony" as in § 924(c)(3)(A); (3) § 373 requires consideration of the actual conduct that the defendant solicited and only then asks if that conduct constitutes a felony that has physical force as an element; and (4) the look-back problems of assessing a prior conviction that spawned the categorical approach do not apply here.

As a threshold issue, we must decide whether, under the prior panel precedent rule, McGuire binds us to apply the categorical approach to the text of § 373.  To do that, we review McGuire in detail.

## A.    Our McGuire Precedent

The defendant in McGuire was convicted of two crimes: (1) attempting to set fire to, damage, destroy, disable, or wreck an aircraft, in violation of 18 U.S.C. § 32(a)(1); and (2) using a firearm during and in relation to that crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A).  McGuire, 706 F.3d at 1335.  The defendant fired a single shot from a handgun in the general direction of an airborne police helicopter.  Id.  McGuire did not involve a prior conviction and a look-back problem.  On appeal, the defendant challenged his § 924(c) firearm conviction,

25

contending that his contemporaneous predicate § 32(a)(1) offense was not categorically a crime of violence as defined in § 924(c)(3). Id. at 1336-37.

The McGuire Court decided two legal questions: (1) whether the text of § 924(c)(3)(A)'s elements clause required use of the categorical approach; and (2) if so, whether all plausible versions of a § 32(a)(1) predicate conviction categorically involve the use, attempted use, or threatened use of physical force under § 924(c)(3)(A) and thereby qualify as a crime of violence. See id. at 1336-38.

As background, § 924(c)(3) defines a crime of violence as "an offense that is a felony" that either: "(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another" (the elements clause); or "(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" (the residual clause).[9]  18 U.S.C. § 924(c)(3)(A)-(B).

As to § 924(c)(3)(A)'s elements clause, the McGuire panel held that it must "employ th[e] categorical approach because of the statute's terms: It asks whether McGuire committed 'an offense' that 'has as an element the use, attempted use, or

---

[9]Unlike the Armed Career Criminal Act ("ACCA") and 18 U.S.C. § 924(c), the § 373 text has no residual clause language.  Compare 18 U.S.C. § 924(c)(3)(B) and 18 U.S.C. § 924(e)(2)(B)(ii), with 18 U.S.C. § 373(a).

26

threatened use of physical force against the person or property of another.'"

McGuire, 706 F.3d at 1336 (first emphasis added).  The McGuire panel reasoned

that whether a § 32(a)(1) conviction is a crime of violence within the meaning of

§ 924(c)(3)(A)'s elements clause is "a question of law . . . that we must answer

'categorically'—that is, by reference to the elements of the offense, and not the

actual facts of McGuire's conduct."  Id.[10]

In McGuire, the Court also explained that, even though McGuire's conduct

of "firing a gun at a flying helicopter is unmistakably violent, we must ask whether

_____

[10]In addition to holding that § 924(c)(3)(A)'s elements clause requires the categorical approach, McGuire also indicated that § 924(c)(3)(B)'s residual clause required the categorical approach.  706 F.3d at 1336–37.  This court, sitting en banc, overruled McGuire to the extent that it held the residual clause required the categorical approach.  Ovalles v. United States, 905 F.3d 1231, 1234 (11th Cir. 2018) (en banc) ("[W]e hold that § 924(c)(3)(B) prescribes a conduct-based approach, pursuant to which the crime-of-violence determination should be made by reference to the actual facts and circumstances underlying a defendant's offense.  To the extent that our earlier decision in United States v. McGuire holds otherwise, it is overruled." (citation omitted)).  The Supreme Court, however, recently abrogated Ovalles.  See United States v. Davis, ___ U.S. ___, ___, 139 S. Ct. 2319, 2325-33 (2019) (holding that § 924(c)(3)(B)'s residual clause mandates the categorical approach and is unconstitutionally vague).

This case concerns language similar to § 924(c)(3)(A)'s elements clause.  McGuire's determination that § 924(c)(3)(A)'s elements clause requires the categorical approach was unaffected by Ovalles and only reinforced by dicta in Davis.  The Government conceded in Davis that the categorical approach would apply to § 924(c)(3)(A)'s elements clause.  See Davis, ___ U.S. at ___, 139 S. Ct. at 2328; id. at ___, 139 S. Ct. at 2339 (Kavanaugh, J., dissenting).  Moreover, the Court indicated in dicta that it agreed that the elements clause called for the categorical approach.  Id. at 2328 (majority opinion) ("Consider the word 'offense.' It's true that 'in ordinary speech,' this word can carry at least two possible meanings. It can refer to 'a generic crime, say, the crime of fraud or theft in general,' or it can refer to 'the specific acts in which an offender engaged on a specific occasion.' . . . [E]veryone agrees that, in connection with the elements clause, the term 'offense' carries the first 'generic' meaning. . . . The language of the residual clause itself reinforces the conclusion that the term 'offense' carries the same 'generic' meaning throughout the statute.").

27

the crime, in general, plausibly covers any non-violent conduct." Id. at 1337.

After concluding that all plausible applications of the statute required the use,

attempted use, or threatened use of physical force, the Court held that the

defendant's § 32(a)(1) conviction categorically qualified as a crime of violence

under § 924(c)(3)(A)'s elements clause. Id.

## B.    Prior Panel Precedent Rule

Under our prior panel precedent rule, we are bound to follow a prior panel's

holding unless and until it is overruled or undermined to the point of abrogation by

an opinion of the Supreme Court or of this Court sitting en banc. United States v.

Archer, 531 F.3d 1347, 1352 (11th Cir. 2008). The prior panel precedent rule

applies regardless of whether the later panel believes the prior panel's opinion to

be correct, and there is no exception to the rule where the prior panel failed to

consider arguments raised before a later panel. See Smith v. GTE Corp., 236 F.3d

1292, 1301-03 (11th Cir. 2001) ("[W]e categorically reject any exception to the

prior panel precedent rule based upon a perceived defect in the prior panel's

reasoning or analysis as it relates to the law in existence at that time."). To

overrule or abrogate a prior panel's decision, the subsequent Supreme Court or en

banc decision "must be clearly on point" and must "actually abrogate or directly

conflict with, as opposed to merely weaken, the holding of the prior panel."

United States v. Kaley, 579 F.3d 1246, 1255 (11th Cir. 2009) (internal quotation

28

marks omitted).

Here, there is no intervening Supreme Court or en banc decision to consider.[11]  Rather, the narrow question is whether our own <u>McGuire</u> panel precedent binds us in this case.  Our prior panel precedent rule "applies only to holdings, not dicta" in our prior opinions.  <u>United States v. Birge</u>, 830 F.3d 1229, 1232 (11th Cir. 2016).  "The holding of a case comprises both the result of the case and those portions of the opinion necessary to that result."  <u>United States v. Caraballo-Martinez</u>, 866 F.3d 1233, 1244 (11th Cir.) (internal quotation marks omitted), <u>cert. denied</u>, 138 S. Ct. 566 (2017).  But "[w]e have pointed out many times that regardless of what [our] court says in its opinion, the decision can hold nothing beyond the facts of that case."  <u>Edwards v. Prime, Inc.</u>, 602 F.3d 1276, 1298 (11th Cir. 2010) (collecting cases).

In contrast, dicta is "a statement that neither constitutes the holding of a case, nor arises from a part of the opinion that is necessary to the holding of the case."  <u>Black v. United States</u>, 373 F.3d 1140, 1144 (11th Cir. 2004).  Stated another way, "dicta is defined as those portions of an opinion that are not necessary to deciding the case then before us."  <u>Caraballo-Martinez</u>, 866 F.3d at 1244 (quoting <u>Kaley</u>, 579 F.3d at 1253 n.10); Obiter Dictum, <u>Black's Law Dictionary</u>

---

[11] As noted previously, <u>supra</u> note 10, <u>McGuire</u>'s determination with respect to the elements clause was not affected by <u>Ovalles</u> and was only reinforced by <u>Davis</u>.

(10th ed. 2014) (explaining that a statement is dictum if it is "unnecessary to the decision in the case"); Bryan A. Garner, et al., The Law of Judicial Precedent 46 (2016) ("Generally, a dictum is a statement in a judicial opinion that is unnecessary to the case's resolution."). "[W]e are not required to follow dicta contained in our own precedents." McNely v. Ocala Star-Banner Corp., 99 F.3d 1068, 1077 (11th Cir. 1996).

**C.    McGuire's Binding Force in this Case**

We first conclude that McGuire's categorical approach ruling—that the text of § 924(c)(3)(A)'s elements clause requires use of the categorical approach in analyzing whether a felony offense qualifies as a crime of violence—was "necessary to [the] result," and therefore part of the holding, in that case. See McGuire, 706 F.3d at 1336-37; Caraballo-Martinez, 866 F.3d at 1244. The use of the categorical approach in McGuire was not dicta because McGuire ruled that § 924(c)(3)(A)'s statutory text required that it apply the categorical approach to determine whether a § 32(a)(1) conviction qualified as a crime of violence. McGuire, 706 F.3d at 1336-38. At least in another § 924(c)(3)(A) case, it is clear that McGuire's use of the categorical approach is binding in evaluating the

30

predicate crime.  See Caraballo-Martinez, 866 F.3d at 1244; Archer, 531 F.3d at

1352.

The more precise and decisive question here, though, is whether McGuire's

holding—that § 924(c)(3)(A)'s statutory text requires a categorical approach—

binds us in this case, which arises under § 373.  For several reasons, we conclude

that it does.  Let's compare the statutory text of § 924(c)(3)(A) and § 373

side-by-side, as follows:

| § 924(c)(1)(A) & (c)(3)(A) makes it unlawful to use or carry a firearm during and in relation to a crime of violence, defined as "an offense that is a felony and (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another." | § 373 makes it unlawful to solicit another with the intent that the other person "engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another . . . , and under circumstances strongly corroborative of that intent, solicits, commands, induces, or otherwise endeavors to persuade such other person to engage in such conduct." |
|---|---|

Both statutes use this same phrase: "a felony" that "has as an element the

use, attempted use, or threatened use of physical force."  Compare 18 U.S.C.

31

§ 924(c)(3)(A), <u>with</u> 18 U.S.C. § 373(a).  Section 373 was enacted as part of the

Comprehensive Crime Control Act of 1984, where the term "crime of violence"

finds its origins.[12]  Pub. L. 98-473, § 1003(a), 98 Stat. 1976, 2138 (1984).  Nearly

identical elements clauses within § 924(c)(3)(A) and § 16's definitions of "crime

of violence,"[13] which also find their origins in the Comprehensive Crime Control

Act of 1984, have been interpreted to require the categorical approach.  <u>See</u> <u>United</u>

<u>States v. Davis</u>, ___ U.S. ___, ___, 139 S. Ct. 2319, 2327-28 (2019) (§ 924(c));

<u>Leocal v. Ashcroft</u>, 543 U.S. 1, 6, 125 S. Ct. 377, 381 (2004) (§ 16).  Because "we

normally presume that the same language in related statutes carries a consistent

---

[12] The Comprehensive Crime Control Act not only added § 373 but also amended § 924(c) to add the term "crime of violence" and enacted 18 U.S.C. § 16's definition of "crime of violence," which contains a nearly identical elements clause.  <u>See</u> Pub. L. 98-473, § 1003(a), 98 Stat. 1976, 2138 (1984) (codified as amended at 18 U.S.C. § 373); <u>id.</u> § 1001(a), 98 Stat. at 2136 (codified at 18 U.S.C. § 16); <u>id.</u> § 1005(a), 98 Stat. at 2138 (codified as amended at 18 U.S.C. § 924(c)).  Until § 924(c)'s subsequent amendment in 1986 to include a definition for crime of violence, which included its elements clause, its use of "crime of violence" in the 1984 amendments was interpreted to refer to § 16's general definition.  <u>See</u> <u>Davis</u>, ___ U.S. at ___, 139 S. Ct. at 2330–31 ("The statutory term 'crime of violence' traces its origins to the Comprehensive Crime Control Act of 1984.  There, Congress enacted the definition of 'crime of violence' in § 16.  It also 'employed the term "crime of violence" in numerous places in the Act,' including in § 924(c).  At that time, Congress didn't provide a separate definition of 'crime of violence' in § 924(c) but relied on § 16's general definition.  The two statutes, thus, were originally designed to be read together." (citations omitted)).

[13] The elements clause in § 16 provides in relevant part:

> The term "crime of violence" means –
>
> (a) an offense that has as an element the use, attempted use, or threatened use of physical force.

32

meaning," <u>Davis</u>, ___ U.S. at ___, 139 S. Ct. at 2329, we construe § 373 to similarly require the categorical approach.

While, as the government and our dissenting colleague point out, there are some textual differences between § 373 and § 924(c)(3), we cannot find them sufficient for a panel to be able to write around our prior panel precedent in <u>McGuire</u>, especially because both § 924(c)(3) and § 373 address contemporaneous conduct, not prior convictions. It is true that § 373 includes use of the word "conduct" whereas § 924(c)(3) does not. <u>Compare</u> § 373 (referencing "[w]hoever, with intent that another person engage in conduct constituting a felony that has as an element"), <u>with</u> § 924(c)(3) (referring to commission of an offense that is a felony and "has as an element"). However, there is little difference between soliciting another to commit a felony that has as an element the use, attempted use, or threatened use of physical force and soliciting another to "engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force." The only difference is that the reference to the criminalized conduct in the former is implicit while the reference to conduct in the latter is explicit. If Congress intended § 373 to be construed differently from § 924(c) and § 16, we do not believe Congress would have used language which conveys almost the same meaning as language which clearly calls for the categorical approach. Moreover, § 373 does not refer to just any conduct; it refers specifically to

33

"conduct constituting a felony that has as an element the use . . . of physical force."  As noted above, established law in <u>Davis</u> and <u>Leocal</u> construe the language—"felony that has as an element the use . . . of physical force"—as requiring the categorical approach.  Thus, § 373 does not refer to just any "conduct"; rather, it refers to "conduct" that constitutes a felony that requires a categorical approach.  We are not persuaded that the textual difference between § 373 and § 924(c) indicates a departure from the categorical approach traditionally required when considering an elements clause.

Strong reasons based in the canons of statutory construction persuade us that we cannot plausibly construe § 373 to avoid the categorical approach and permit consideration only of the conduct charged in the particular case, as the dissent proposes.  First, as noted above, the canon—presuming that language carries the same meaning as does the same language in related statutes—and the fact that § 373 was enacted as part of the Comprehensive Crime Control Act of 1984 along with amendments to § 924(c) and the enactment of § 16—all including nearly identical elements clauses—indicate that Congress intended § 373 should also be construed as requiring a categorical approach as do § 924(c) and § 16.  Second, the phrase "that has as an element" modifies the immediately preceding word "felony"—not the more remote word "conduct."  <u>See</u> Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 152 (2012) ("When the

34

syntax involves something other than a parallel series of nouns or verbs, a prepositive or postpositive modifier normally applies only to the nearest reasonable referent.").  Third, the text of § 373 makes it absolutely clear that the elements clause—"that has as an element" —modifies the immediately preceding word "felony" and not the more remote word "conduct."  Conduct (i.e., underlying facts) cannot have constituent elements; only a felony's legal definition can.

> "Elements" are the "constituent parts" of a crime's legal definition—the things the "prosecution must prove to sustain a conviction." Black's Law Dictionary 634 (10th ed. 2014). At a trial, they are what the jury must find beyond a reasonable doubt to convict the defendant, see Richardson v. United States, 526 U.S. 813, 817, 119 S. Ct. 1707, 143 L.Ed.2d 985 (1999); and at a plea hearing, they are what the defendant necessarily admits when he pleads guilty, see McCarthy v. United States, 394 U.S. 459, 466, 89 S. Ct. 1166, 22 L.Ed.2d 418 (1969). Facts, by contrast, are mere real-world things—extraneous to the crime's legal requirements. (We have sometimes called them "brute facts" when distinguishing them from elements. Richardson, 526 U.S., at 817, 119 S. Ct. 1707.) They are "circumstance[s]" or "event[s]" having no "legal effect [or] consequence": In particular, they need neither be found by a jury nor admitted by a defendant. Black's Law Dictionary 709.

Mathis v. United States, ___ U.S. ___, ___, 136 S. Ct. 2243, 2248 (2016).  Thus, we construe § 373's phrase "felony that has as an element the use, attempted use, or threatened use of physical force" to refer categorically to the felony in question. The categorical approach permits courts to look only to statutory definitions of the crime.  See Taylor v. United States, 495 U.S. 575, 602, 110 S. Ct. 2143, 2160 (1990).  Of course, when the underlying crime arises from a divisible statute (a statute defining multiple crimes by listing multiple, alternative elements), the

35

modified categorical approach may be applied, which permits courts to consult Shepard[14] documents to determine which version of the underlying crime is at issue. See Mathis, ___ U.S. at ___, 136 S. Ct. at 2245; see also infra Section V.D.

The dissent proposes a novel analysis. The dissent proposes, in effect, to apply the modified categorical approach to an indivisible statute.[15] Gillis is charged with soliciting another to commit kidnapping under 18 U.S.C. §1201(a). As we later demonstrate, see infra Section V.D., § 1201(a) is an indivisible statute, which the dissent effectively concedes. The dissent proposes to consider the actual conduct with which Gillis was charged, as evidenced by Shepard documents, and then determine "whether that solicited 'conduct' constitutes a felony that has the use, attempted use, or threatened use of force as an element." The dissent's approach necessarily treats the underlying felony at issue—here, § 1201(a)—as divisible by looking to Shepard documents to rule out the indivisible means

---

[14] Shepard v. United States, 544 U.S. 13, 125 S. Ct. 1254 (2005).

[15] The dissent consults the indictment and jury instructions to rule out the indivisible means "inveiglement" and "decoy" from its analysis. The modified categorical approach—i.e., the use of Shepard documents like indictments and jury instructions to determine which of several alternative elements were necessarily involved in the underlying felony—is permissible only in divisible statutes. See Mathis, ___ U.S. at ___, 136 S. Ct. at 2248-49. When the statute at issue is indivisible, as is § 1201(a), Shepard documents may not be used to determine which of several alternative means of committing the crime were involved in the underlying felony. See id. at ___, 136 S. Ct. at 2253.

"inveigle" and "decoy" from consideration in step two of its analysis.[16]  We do not

believe this approach to be consistent with Supreme Court precedent.  See Mathis,

___ U.S. at ___, 136 S. Ct. at 2253 ("'[T]he only [use of the modified categorical

approach] we have ever allowed,' . . .  is to determine 'which element[s] played a

part in the defendant's conviction.'" (quoting Descamps v. United States, 570 U.S.

254, 260, 263, 133 S. Ct. 2276, 2283, 2285 (2013)) (first and third alterations in

original)).[17]

    Although there is some daylight between the § 373 and § 924(c)(3)(A) texts,

there is not enough for a panel of our Court to chart a new course and depart from

---

[16] The dissent does not ultimately decide whether it is proper to consider only Shepard documents (e.g., the indictment and jury instructions) or the entire trial evidence.  But it is clear that the dissent is considering the actual conduct of Gillis, and that is inconsistent with the categorical approach.  And the dissent's actual analysis focuses on kidnapping by unlawful confinement, which relies on the indictment, a Shepard document.  That analysis assumes the modified categorical approach, which is impermissible in the context of an indivisible statute like § 1201(a).

[17] The dissent highlights that Mathis considered the ACCA, a statute that considers prior convictions rather than current conduct, and submits that this distinction supports its construction of § 373.  This past term in Davis, however, the Court held that the categorical approach applies to § 924(c)—a statute that considers a crime currently before the court, not prior convictions.  Like § 924(c), § 373 also considers a crime currently before the court.  We are thus not persuaded by the dissent's distinction. The dissent also asserts, with no supporting authority, that the Mathis rule—i.e, the use of Shepard documents to rely on a defendant's actual conduct is permissible only in divisible statutes—does not apply to § 373.  To the extent the dissent relies on Mathis involving a prior conviction, the dissent's position is undetermined by Davis.  To the extent that the dissent relies on § 373's explicit reference to "conduct," we disagree for the reasons stated above—i.e., that the mere use of the term "conduct" in § 373 does not persuade us that we can depart from the categorical approach traditionally required when construing these elements clauses.

McGuire's categorical approach when applying the elements clause in § 373.[18]

Therefore, we conclude that our McGuire precedent binds us to use the categorical

---

[18] Pursuant to the canons of statutory construction and for the reasons set out above, we respectfully do not believe that § 373 is most plausibly read as our dissenting colleague proposes. The core of the dissent's position relies upon the fact that § 373 explicitly uses the word "conduct" while § 924(c) does not. Contrary to the dissent's suggestion with respect to the only canon on which it relies, we have not disregarded Congress's use of the word "conduct" in § 373. Rather, we recognize that § 373 uses the word "conduct" while § 924(c) does not, but we do not believe that difference can bear the weight the dissent places on it. As set forth above, § 373 uses the word "conduct" but carries virtually the same meaning as the corresponding sentences in § 924(c) and § 16, both of which clearly evoke the categorical approach. The only difference is that § 924(c) and § 16 only implicitly refer to conduct. Moreover, the reference to "conduct" in § 373 specifically references only "conduct constituting a felony that has as an element the use . . . of physical force,"—i.e., "conduct" constituting a felony that requires a categorical approach. In light of the fact that §§ 373, 924(c), and 16 all include the prominent and nearly identically worded elements clause that is the hallmark of the categorical approach, and in light of the fact that those elements clauses all find their origins in the Comprehensive Crime Control Act of 1984, we do not believe that Congress signaled the substantially different interpretation for § 373 that the dissent proposes.

The dissent's argument that § 373 does not include the word "conviction" or the word "offense" has little force in light of the fact that § 373 does use the word "felony." And the statute refers to a specific kind of felony—i.e., a "felony that has as an element the use . . . of physical force" (that is, a felony that requires a categorical approach.).

Although we reject the dissent's characterization of our focus as only on "a hypothetical defendant's imagined conduct," of course we do focus on "inveigle" and "decoy," the least culpable means of violating § 1201(a). This focus is required by the categorical approach. See infra Section V.D.

Nor does the dissent's citation to the legislative history of § 373 support its position. Although the final version of § 373 no longer relied on the definition of "crime of violence" in § 16, it included its own requirement that the "felony" had to have "as an element," the "use, attempted use, or threatened use of physical force"—the very language which established law construes as requiring the categorical approach.

Under all the circumstances, we conclude that § 373 is most plausibly read as we set forth, and not as our dissenting colleague proposes. However, to the extent that there is any ambiguity left, we believe the rule of lenity would indicate the categorical approach. The rule "only applies if, after considering text, structure, history, and purpose, there remains a 'grievous ambiguity or uncertainty in the statute,' such that the Court must simply 'guess as to what Congress intended.'" Barber v. Thomas, 560 U.S. 474, 488, 130 S. Ct. 2499, 2508 (2010)

approach to determine whether the solicited crime—here, § 1201(a) federal kidnapping—"has as an element the use, attempted use, or threatened use of physical force" against another person or property, as required by § 373.

## D.    Section 1201(a) Kidnapping

In relevant part, the federal kidnapping statute provides:

> Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away <u>and</u> holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof . . . shall be punished by imprisonment for any term of years or for life . . . .

18 U.S.C. § 1201(a) (emphasis added).  Two elements of § 1201(a) kidnapping are: (1) unlawfully seizing, confining, inveigling, decoying, kidnapping, abducting, or carrying away the victim; and (2) holding the victim for ransom or reward or otherwise.  <u>Id.</u>; <u>Chatwin v. United States</u>, 326 U.S. 455, 459, 66 S. Ct. 233, 235 (1946).[19]

---

(citations omitted).  We do not believe a grievous ambiguity remains, but to the extent it does, the rule of lenity would require an interpretation favorable to Gillis—i.e., an interpretation calling for application of the categorical approach.  <u>See</u> <u>Leocal</u>, 543 U.S. at 11 n.8, 125 S.Ct. at 384 n.8 (applying the rule of lenity in a very similar context.).

[19]To be convicted of federal kidnapping, the offender's conduct also must satisfy one of the jurisdictional elements in the statute, such as where the offender (1) willfully transports the victim in interstate or foreign commerce; (2) himself travels in interstate or foreign commerce in committing or in furtherance of the offense; or (3) uses any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the offense.  18 U.S.C. § 1201(a)(1).  There is no challenge to the fact that the kidnapping conduct Gillis solicited would satisfy one of these jurisdictional elements.

In applying the categorical approach to § 1201(a), we must first determine whether the statutory phrase "unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away" lists divisible alternative elements defining separate kidnapping crimes or is an indivisible list of factual means by which a single kidnapping crime may be committed. If these are alternative elements, then the statute is divisible and the modified categorical approach, which permits consulting Shepard documents, applies. See Cintron v. U.S. Att'y Gen., 882 F.3d 1380, 1384 (11th Cir. 2018) (citing Descamps, 570 U.S. at 263, 133 S. Ct. at 2281, 2285; Mathis v. United States, ___ U.S. ___, ___, 136 S. Ct. 2243, 2249 (2016)). If these are illustrative means, then the statute is indivisible and the categorical approach, which does not permit consulting Shepard documents, applies. See Mathis, ___ U.S. at ___, 136 S. Ct. at 2253-54; Descamps, 570 U.S. at 258, 133 S. Ct. at 2282; Cintron, 882 F.3d at 1384, 1385 n.6.

In determining whether a statutory provision lists alternative elements or illustrative means, we consider first the text of the statute, second relevant decisional law, and third other evidence such as indictments and jury instructions. See Cintron, 882 F.3d at 1385. "If these sources do not 'speak plainly,' courts must resolve the inquiry in favor of indivisibility." Id. Here, the text of § 1201(a) is strongly suggestive of indivisibility. As we explained in Cintron: "If, for example, the statute provides for tiered punishments depending on particular

40

statutory alternatives, the alternatives are elements.  Conversely, if the statute is

'drafted to offer "illustrative examples,"' those examples are means of committing

the offense, not elements."  Id. at 1385 (quoting and citing Mathis, ___ U.S. at ___,

136 S. Ct. at 2256).  The Supreme Court in Mathis described such a statute that

enumerates various factual means of committing a single element:

> To use a hypothetical adapted from two of our prior decisions, suppose
> a statute requires use of a "deadly weapon" as an element of a crime
> and further provides that the use of a "knife, gun, bat, or similar
> weapon" would all qualify. Because that kind of list merely specifies
> diverse means of satisfying a single element of a single crime—or
> otherwise said, spells out various factual ways of committing some
> component of the offense—a jury need not find (or a defendant admit)
> any particular item: A jury could convict even if some jurors
> "conclude[d] that the defendant used a knife" while others "conclude[d]
> he used a gun," so long as all agreed that the defendant used a "deadly
> weapon."

Mathis, ___ U.S. at ___, 136 S. Ct. at 2249 (citing Richardson v. United States,

526 U.S. 813, 817, 119 S. Ct. 1707, 1710 (1999); Descamps, 570 U.S. at 268-69,

133 S. Ct. at 2288-89).

Here, § 1201(a) specifies that whoever "unlawfully seizes, confines,

inveigles, decoys, kidnaps, abducts, or carries away"—while also satisfying the

other elements of the offense—"shall be punished by imprisonment for any term of

years or for life and, if the death of any person results, shall be punished by death

or life imprisonment."  § 1201(a).  These alternative means of establishing the first

element of kidnapping are "denominated as a single offense" and punished by the

41

same penalty regardless of the means used.  The diverse means of satisfying this element include several that are nearly synonymous—inveigle and decoy, abduct and carry away—showing that a jury could convict even if some jurors concluded that the defendant "inveigled" while others concluded that he "decoyed," so long as all agreed that this first element was established.  Accordingly, the text of § 1201(a) suggests that the several methods of violating the statute are all factual means of accomplishing "kidnapping" rather than separate elements creating several distinct kidnapping offenses.  See Cintron, 882 F.3d at 1385-86; see also United States v. St. Hubert, 909 F.3d 335, 348 (11th Cir. 2018) (determining that 18 U.S.C. § 1951(b)(1)'s definition of "robbery" is indivisible because it sets out alternative means of committing the offense rather than setting out multiple different robbery crimes), cert denied, 139 S. Ct. 1394 (2019).

Relevant decisional law similarly suggests that § 1201(a) sets forth illustrative means and not alternative elements.  In United States v. Boone, this Court characterized inveigling or decoying "as means of kidnapping under the statute," and used the terms as interchangeable synonyms in describing "kidnappings accomplished solely by the seduction of victims."  See 959 F.2d 1550, 1557 (11th Cir. 1992) (emphasis added) (internal quotation marks omitted).  While we have not previously considered whether this statutory phrase describes means or elements (or, in other words, whether it is indivisible or divisible), the

42

only court to consider the issue has concluded that the statute lists indivisible means. See United States v. Rubio, No. 1:08-CR-297-LJO-2, 2016 WL 6821854, at *8 (E.D. Cal. Nov. 17, 2016) (O'Neill, C.J.); United States v. Bustos, No. 1:08-CR-297-LJO-3, 2016 WL 6821853, at *8 (E.D. Cal. Nov. 17, 2016) (O'Neill, C.J.).

Finally, the indictment in this case also indicates indivisibility. "[A]n indictment . . . could indicate, by referencing one alternative term to the exclusion of all others, that the statute contains a list of elements, each one of which goes toward a separate crime." Mathis, ___ U.S. at ___, 136 S. Ct. at 2257. The indictment in this case omitted "inveigles" and "decoys" and charged Gillis with soliciting kidnapping "by seizing, confining, kidnapping, abducting, and carrying away." The indictment in this case, in charging the § 373 offense, listed multiple manners of carrying out the underlying § 1201(a) offense. The indictment in this case did not list one term to the exclusion of all others, indicating that such terms are means, not elements. Moreover, some of the means listed in the indictment are nearly synonymous (i.e., abducting and carrying away) illustrating that a jury need not agree on the specific means employed, just that the first element was satisfied. Because all of the information before us points in the same direction, we have no trouble concluding that § 1201(a) is indivisible and that the categorical, rather than the modified categorical, approach applies.

43

In applying the categorical approach, "we must presume that the conviction rested upon [nothing] more than the least of th[e] acts criminalized, and then determine whether even those acts" qualify under § 373.  See St. Hubert, 909 F.3d at 349 (quoting Moncrieffe v. Holder, 569 U.S. 184, 190-91, 133 S. Ct. 1678, 1684 (2013)); United States v. Davis, 875 F.3d 592, 597 (11th Cir. 2017) ("If the statute is indivisible, we use the categorical approach.  In that case a conviction under it qualifies as a violent felony only if all of the acts criminalized in the statute involve the use of physical force against the person of another.").  Accordingly, in considering whether violations of § 1201(a) necessarily involve the "use, attempted use, or threatened use of physical force against property or against the person of another" as to qualify under § 373(a), we presume that the federal kidnapping conviction rested upon means of inveiglement and/or decoy—the least of the acts criminalized by § 1201(a).[20]

## E.    Physical Force Requirement

With this least culpable conduct criminalized by § 1201(a) in mind, we must now determine whether the offense necessarily "has as an element the use, attempted use, or threatened use of physical force against property or against the person of another" as to satisfy § 373(a).  In considering this question, we look to

---

[20]Of course, the least of the acts criminalized—inveiglement and decoy—suffices to commit the crime only if the other element—"holds for ransom or reward or otherwise"—is also satisfied.  § 1201(a).

44

cases considering the ACCA's elements clause and § 921(a)(33)(A)'s misdemeanor crime of domestic violence definition for guidance.  This is because, first, those statutes have similar force clauses to § 373(a).  Compare 18 U.S.C. § 373(a) ("the use, attempted use, or threatened use of physical force against property or against the person of another"), with 18 U.S.C. § 924(e)(2)(B)(i) ("the use, attempted use, or threatened use of physical force against the person of another"), and 18 U.S.C. § 921(a)(33)(A) ("the use or attempted use of physical force").  Second, all the relevant statutes contemplate violent force.  Compare 18 U.S.C. § 373 (titled "Solicitation to commit a crime of violence"), with 18 U.S.C. § 924(e)(2)(B) (defining "violent felony"), and 18 U.S.C. § 921(a)(33)(A) (defining "misdemeanor crime of domestic violence").

The Supreme Court, in Curtis Johnson v. United States, considered the meaning of "physical force" within the ACCA's elements clause.  559 U.S. 133, 138, 130 S. Ct. 1265, 1270 (2010).  The Court stated that "[t]he adjective 'physical' is clear in meaning . . . . It plainly refers to force exerted by and through concrete bodies—distinguishing physical force from, for example, intellectual force or emotional force."  Id.; see also Stokeling v. United States, ___ U.S. ___, ___, 139 S. Ct. 544, 552 (2019) (stating the same).  The Supreme Court, in United States v. Castleman extended this observation to § 921(a)(33)(A)'s misdemeanor crime of violence definition.  572 U.S. 157, 170, 134 S. Ct. 1405, 1414 (2014).

45

We accordingly have no trouble concluding that § 373(a)'s reference to "physical force" also "refers to force exerted by and through concrete bodies—distinguishing physical force from, for example, intellectual force or emotional force."  See Curtis Johnson, 559 U.S. at 138, 130 S. Ct. at 1270.

The next question is whether § 1201(a) kidnapping by means of inveiglement or decoy categorically involves the use, attempted use, or threatened use of physical force sufficient to satisfy § 373(a)'s force clause.

**F.    Kidnapping by Means of Inveiglement or Decoy**

We first pause to define "inveigle" and "decoy."  The New Oxford American Dictionary defines "inveigle" as to "persuade (someone) to do something by means of deception or flattery" while Merriam-Webster's Collegiate Dictionary defines it as "to win over by wiles" and "to acquire by ingenuity or flattery."  New Oxford American Dictionary 913 (3d ed. 2010); Merriam-Webster's Collegiate Dictionary 616 (10th ed. 1999).  As to "decoy," the New Oxford American Dictionary defines it as to "lure or entice (a person or animal) away from an intended course, typically into a trap" while Merriam-Webster's Collegiate Dictionary defines it as "to lure by or as if by a decoy."  New Oxford American Dictionary 451 (3d ed. 2010); Merriam-Webster's Collegiate Dictionary, 300 (10th ed. 1999).  The plain meanings of "inveigle" and "decoy" indicate that these means of violating the federal kidnapping statute require intellectual or

46

emotional force, distinct from the requisite physical force required to satisfy § 373(a)'s force clause.

Next, we look to case law considering kidnapping by means of inveiglement and/or decoy prosecuted under § 1201(a) to determine whether the statute necessarily requires physical force as opposed to intellectual or emotional force.

The Supreme Court in Chatwin v. United States reversed the defendants' federal kidnapping convictions because there was no evidence that the victim was "held" against her will. See 326 U.S. 455, 460-62, 66 S. Ct. 233, 235-36 (1946). Defendant Chatwin, a 68-year-old man, hired a 15-year-old girl, Dorothy Wyler, as his live-in housekeeper and taught Wyler that plural marriage conformed with the true principles of the Mormon faith. Id. at 457, 66 S. Ct. at 234. Wyler entered into a "celestial marriage" with Chatwin and became pregnant. Id. at 457-58, 66 S. Ct. at 234.

Wyler's parents informed the authorities, who took Wyler into juvenile custody. Id. at 458, 66 S. Ct. at 234. Later, after being dropped off at a movie theatre by a juvenile probation officer, Wyler left the theatre and ultimately traveled to Mexico to be legally married to Chatwin. Id. at 458, 66 S. Ct. at 234-35. Subsequently, Wyler and Chatwin traveled back to Utah and then to Arizona, where federal authorities eventually found them living under assumed names. Id. at 458, 66 S. Ct. at 235. Chatwin and two codefendants, who had traveled to

47

Mexico with Wyler, were convicted of kidnapping Wyler.  Id. at 458-59, 66 S. Ct. at 235.

Reversing the convictions, the Supreme Court explained that the kidnapping statute "contemplates that the kidnapped victim shall have been (1) unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away by any means whatsoever and (2) held for ransom or reward or otherwise."  Id. at 459, 465, 66 S. Ct. at 235, 237 (internal quotation marks omitted).  The government argued that both elements were met, asserting that the defendants unlawfully "inveigled" or "decoyed" Wyler away from the custody of her parents and the juvenile court authorities and that she was "held" during the period between her escape from juvenile custody and her trip to Mexico to marry Chatwin.  Id. at 459, 66 S. Ct. at 235.  The Supreme Court rejected those arguments, holding that the government failed to prove that Wyler was "held" within the meaning of the kidnapping statute.  Id. at 460, 66 S. Ct. at 235.

The Supreme Court explained that:

> The act of holding a kidnapped person . . . necessarily implies an unlawful physical or mental restraint for an appreciable period against the person's will and with a willful intent so to confine the victim.

Id. (emphasis added).  There was no evidence in Chatwin that the defendants "imposed at any time an unlawful physical or mental restraint upon [Wyler's] movements" or that "she was deprived of her liberty, compelled to remain where

48

she did not wish to remain, or compelled to go where she did not wish to go." Id. In other words, the government failed to prove an act of unlawful restraint because there was no proof that the defendants "willfully intended through force, fear or deception to confine [Wyler] against her desires." Id. at 460, 66 S. Ct. at 235-36.

While not addressing whether the first element of kidnapping can be satisfied by means of inveiglement and/or decoy not involving the use, threatened use, or attempted use of physical force, Chatwin makes clear that the second "holding" element may be satisfied by use of "physical or mental restraint." It makes clear that the second element (the "holding" requirement) of federal kidnapping can encompass intellectual or emotional force of the type distinguished from the requisite "physical force" in Curtis Johnson. See 559 U.S. at 138, 130 S. Ct. at 1270.

Next, the federal kidnapping considered in United States v. Boone, 959 F.2d 1550 (11th Cir. 1992), similarly involved "inveiglement" or "decoy" under § 1201(a) with no physical restraint of the victim. In Boone, the defendant Boone and the victim Jonathan Wood drank and used drugs together, and Boone later convinced Wood to travel with him to Georgia, falsely telling Wood of a marijuana patch located there. Id. at 1552. The men drove to Georgia in victim Wood's car with Boone at the wheel. Id. In a rural area in Georgia, Boone and Wood proceeded on foot into a wooded area, at which time Boone "borrowed" Wood's

49

knife.  Id. at 1553.  After walking some distance, the victim Wood realized that he had been deceived and there was no marijuana patch.  Id.  Boone then stabbed Wood, tied him up, and left him to die.  Id.

This Court determined that there was sufficient evidence to support Boone's § 1201 kidnapping conviction.[21]  Id. at 1557.  We explained that inveigling or decoying someone across state lines alone does not constitute kidnapping.  Id. at 1555.  Rather, kidnapping by inveiglement occurs when "the alleged kidnapper had the willingness and intent to use physical or psychological force to complete the kidnapping in the event that his deception failed."  Id. (emphasis added).  In other words, "[w]here an inveiglement occurs and force is held in reserve only because the kidnapper's deception is operating successfully, an unlawful interference with the actions of another has occurred—whether or not that person is aware of the interference—such that a kidnapping and holding has occurred under the statute."  Id. at 1556.

Applying those principles, this Court concluded that Boone's conduct constituted a kidnapping by inveiglement despite the fact that "force was not used prior to the crossing of state lines."  Id.  We explained that Boone inveigled Wood

---

[21]Although the Boone Court concluded that there "was indeed sufficient evidence for a properly instructed jury to have convicted the defendant" of kidnapping, the Court remanded Boone's case for a new trial because the district court did not properly instruct the jury on the intent element of Boone's kidnapping offense.  Boone, 959 F.2d at 1557-58.

into driving to Georgia and then traveled with him, even driving Wood's car. Id. Thus, Boone remained at all times "in a position where he could use force to ensure the kidnapping and transporting of Wood to the remote site where the murder . . . would take place." Id. We noted that Boone had placed Wood under both mental and physical restraints resulting from "the deception Boone created and from Boone's apparent willingness to use force to keep Wood restrained." Id.[22]

In reaching this conclusion, the Boone Court distinguished our prior precedent in United States v. McInnis, 601 F.2d 1319 (5th Cir. 1979),[23] in which the victim was lured from Texas to Mexico, but the victim traveled alone. Boone, 959 F.2d at 1556. In the event the victim was not successfully tricked into going to Mexico, there were no further steps, forcible or otherwise, to kidnap him. Id. The former Fifth Circuit stated that the entirely voluntary act of a victim in crossing state lines does not violate the kidnapping statute even if it was induced by deception. Id. at 1557.

---

[22]Quoting Boone, the Annotations and Comments to this Court's pattern jury instruction on § 1201(a) kidnapping state: "'Inveiglement' becomes unlawful under the federal kidnapping statute, 'when the alleged kidnapper interferes with his victim's action, exercising control over his victim through the willingness to use forcible action should his deception fail.'" Eleventh Circuit Pattern Jury Instructions (Criminal Cases) O49 (2016) (quoting Boone, 959 F.2d at 1555 n.5).

[23]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

The Boone Court explained that because the victim in McInnis was supposed to travel alone in crossing state lines, the victim was not "continually subjected to a kidnapper's ongoing efforts to maintain the deception and advance the intended kidnapping." Id. In other words, the McInnis kidnappers "did not stand ready to use force against their victim, thereby exercising control over him." Id. By contrast, in a case like Boone's where the kidnapper accompanies the inveigled victim, "[t]he victim is kept from acting in an entirely voluntary manner by the acts, presence, and intent of his inveigling kidnapper." Id.

Boone demonstrates that a federal kidnapping conviction may be sustained where kidnapping by means of inveiglement or decoy has occurred without the use of force and where the kidnapper has "the willingness and intent to use physical or psychological force to complete the kidnapping in the event that his deception failed." Id. at 1555 (emphasis added). The victim in Boone was inveigled and decoyed across state lines without the use of physical force. Id. at 1552-53. This Court determined that it is up to the fact finder to determine whether the kidnapper held physical or psychological force in reserve "in the event that his deception failed." Id. at 1555. Accordingly, Boone makes clear that federal kidnapping may be committed by means of inveiglement and/or decoy (without the use of physical force) and then maintained solely by psychological force.

52

Cases from our sister circuits similarly demonstrate that § 1201(a) can be violated without the use of physical force.  See United States v. Jenkins, 849 F.3d 390, 393-94 (7th Cir. 2017) (holding that § 1201(a) kidnapping can be committed "without using, threatening to use, or attempting to use physical force"), judgment vacated on other grounds, 138 S. Ct. 1980 (2018); United States v. Lentz, 383 F.3d 191, 203-04 (4th Cir. 2004) (reversing a grant of judgment of acquittal where the defendant, without physical force, inveigled the victim into traveling across state lines and there was circumstantial evidence that "unlawful physical or mental restraint" was used to hold the victim); United States v. Wills, 234 F.3d 174, 177 (4th Cir. 2000) ("By its terms, § 1201(a) criminalizes kidnappings accomplished through physical, forcible means and also by nonphysical, non-forcible means."); United States v. Garcia, 854 F.2d 340, 344-45 (9th Cir. 1988) (holding that a kidnapping continued past the date the defendant told the victim to leave, even though no force was used after this date, because the psychological effects of the kidnapping persisted).[24]

The above-discussed cases leave no doubt that § 1201(a) convictions can be sustained in cases where physical force was not used.  Beyond those cases, we further believe that there is a realistic probability that future federal prosecutions

---

[24] See also Delgado-Hernandez v. Holder, 697 F.3d 1125, 1130 (9th Cir. 2012) (stating in dicta that "[t]he federal kidnapping statue has no force requirement.").

53

could charge defendants who have not used physical force with violating

§ 1201(a).  See United States v. Vail-Bailon, 868 F.3d 1293, 1306 (11th Cir. 2017)

(considering hypotheticals proffered by defendant to determine whether Florida

felony battery was a crime of violence).  A hypothetical discussed at oral argument

provides a persuasive example of this realistic probability.  Consider the following

scenario involving a grandparent (A); the grandparent's child (B); and (C), the

child of B and grandchild of A.  A perceives B as an unfit parent, not living up to

A's perception of good parenting (or perhaps influenced by in-law or other

domestic tensions).  A decides to intervene and absconds with C, holding C against

the wishes of B and saying that C will be returned to B when B reforms and

conforms to A's perception of a fit parent.  In this hypothetical situation, it is

entirely feasible that A might abscond with C by inveiglement and hold C using

psychological force only—all without the use, threatened use, or attempted use of

physical force against either B or C.[25]  We do not believe this hypothetical is of the

"far-fetched" variety that this Court has declined to treat as indicating that a statute

---

[25]The second element of § 1201(a)—holding "for ransom or reward or otherwise"—is easily satisfied by this hypothetical as it merely requires that the captor seeks to "secure some benefit to himself."  Gooch v. United States, 297 U.S. 124, 128, 56 S. Ct. 395, 397 (1936). "Otherwise" has been construed broadly to cover many sought benefits.  See United States v. Satterfield, 743 F.2d 827, 849-50 (11th Cir. 1984) (determining that kidnapping an individual to silence them as a potential witness satisfied the "or otherwise" requirement), superseded by statute on other grounds as recognized by United States v. Edwards, 728 F.3d 1286, 1292 (11th Cir. 2013); see also United States v. Smith, 831 F.3d 793, 802 (7th Cir. 2016) (finding "or otherwise" to be satisfied where the defendant kidnapped an infant because she wanted a baby); United States v. Montgomery, 635 F.3d 1074, 1086 (8th Cir. 2011) (same).

can be violated in a non-physically forceful manner.  See, e.g., id. at 1305.

Moreover, innumerable courts (including those discussed above) have followed the

Supreme Court in Chatwin in expressly contemplating that the federal kidnapping

crime can be committed by mere inveiglement and holding the victim by either

physical or psychological force.  These cases did not involve far-fetched situations;

they demonstrate the realistic probability of future prosecutions of § 1201(a) where

there has been no use, threatened use, or attempted use of physical force.

Because § 1201(a) can be violated without the "use, attempted use, or

threatened use of physical force against property or against the person of another"

as required by § 373(a)'s force clause, and because we know from Curtis Johnson

and its progeny that "physical force" does not include "intellectual force or

emotional force," we conclude that Gillis's § 373 conviction must be reversed.  We

do not reach this conclusion lightly.  Undoubtedly, many and perhaps even most

federal kidnappings do, as a factual matter, involve uses of force against the

victim.  See, e.g., United States v. Adams, 83 F.3d 1371, 1372 (11th Cir. 1996)

(defendant husband kidnapped his wife by attempting to force her into her car and

shooting her in the abdomen when she broke free and began to run away).

However, binding precedent requires that we apply the categorical approach and

close our eyes to Gillis's actual conduct.  And in deciding whether § 1201(a)

kidnapping can realistically be committed without the use, threatened use, or

attempted use of physical force, we cannot close our eyes to the fact that the

Supreme Court has said that it can be committed using either physical or mental

restraint and that numerous circuit courts have followed suit.

For the foregoing reasons, the judgment of the district court is

AFFIRMED IN PART AND REVERSED IN PART.

HULL, Circuit Judge, concurring in part and dissenting in part:

## I. CONCURRENCE

Gillis challenges his convictions (1) in Count 1 for attempting to knowingly induce a child to engage in sexual activity, in violation of 18 U.S.C. § 2422(b), and (2) in Count 2 for soliciting another person to "engage in conduct" that constitutes the felony crime of federal kidnapping under 18 U.S.C. § 1201(a), in violation of 18 U.S.C. § 373.  I concur in full in Sections I through IV of the panel opinion, which affirm Gillis's child enticement conviction and the district court's rulings as to the experts' testimony.

## II. DISSENT

Because I disagree with the majority's statutory interpretation of § 373, I am unable to concur in Section V of the majority opinion, which vacates Gillis's § 373 conviction for solicitation of the violent kidnapping of his coworker M.O.

The statutory text of § 373 explicitly focuses on the "conduct" Gillis solicited another person to "engage in."  18 U.S.C. § 373(a) (emphasis added). Specifically, § 373 makes it unlawful for a defendant, like Gillis, "to solicit another person with the intent that the other person engage in conduct constituting a felony that has as an element the use, attempted use or threatened use of physical force" and "under such circumstances strongly corroborative of that intent" to persuade "such other person to engage in such conduct."  18 U.S.C. § 373 (emphasis added).

In my view, the majority's statutory interpretation of § 373 incorrectly disregards the "engage in conduct" language used <u>twice</u> in § 373's text.

Despite this "engage in conduct" text, the majority mistakenly construes the § 373 statutory language to require an ordinary-case categorical approach whereby the majority considers only a hypothetical defendant's imagined conduct—as opposed to the actual kidnapping conduct that the indictment charged Gillis with soliciting.[1]  What's more, the majority decides that the least culpable imagined form of kidnapping would be "inveigling" a victim through deception without physical force and that because a hypothetical inveiglement kidnapping would not satisfy the force clause, Gillis's § 373 conviction for soliciting the violent kidnapping of his co-worker must be vacated.  In ignoring the kidnapping conduct charged in Gillis's indictment, the majority treats the "engage in conduct" statutory language as mere surplusage and reads it out of the § 373 statute.  Here is why I disagree with the majority's statutory interpretation of § 373.

## A.    18 U.S.C. § 373

As does the majority, let's compare the text of § 373 and 18 U.S.C. § 924(c):

| § 373 makes it unlawful to solicit another with the intent <u>that the other person</u> "engage in conduct constituting a felony that has as an | § 924(c)(1)(A) makes it unlawful to use or carry a firearm "during and in relation to <u>any crime of violence</u>." § 924(c)(3) defines "crime of |
|---|---|

---

[1] As explained later, even Gillis ignores "inveigles" and "decoys" in the § 1201(a) kidnapping statute and relies on the kidnapping conduct charged in the indictment to resolve this case, and we should, too.

| element the use, attempted use, or threatened use of physical force against property or against the person of another . . ., and under circumstances strongly corroborative of that intent, solicits, commands, induces, or otherwise endeavors <u>to persuade such other person to engage in such conduct</u>." (emphasis added) | <u>violence</u>" as "<u>an offense</u> that is a felony" and "(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." (emphasis added) |

By now, courts are fully conversant with the § 924(c) text.  The § 924(c)(1) substantive offense is carrying a firearm during a "crime of violence."  In turn, § 924(c)(3) defines "crime of violence" as "an offense" that is a felony qualifying under either a residual clause or an elements clause.

In stark contrast, the § 373 text twice refers to "engage in <u>conduct</u>," and does not refer to a "crime of violence" or "an offense."  That alone is a major textual difference.  Indeed, to obtain a § 373 conviction, the government must show that: (1) the defendant Gillis solicited another person to "engage in <u>conduct</u>"; (2) that the solicited conduct constitutes "a felony that has as an element the use, attempted use, or threatened use of physical force"; and (3) Gillis solicited such other person "to engage <u>in such conduct</u>" "under circumstances strongly corroborative of that intent."  18 U.S.C. § 373(a) (emphasis added).[2]

---

[2]I recognize that the § 373 statute is titled "Solicitation to commit a crime of violence." And though it might be tempting to look to the title of § 373 in interpreting that statute and drawing similarities between § 373 and § 924(c), Congress has forbidden us from doing so as to Title 18.  <u>See</u> Act of June 25, 1948, ch. 645, § 19, 62 Stat. 862 ("<u>No inference of a legislative</u>

The § 373 text directs our focus, not once but twice, to the "conduct" that the defendant solicited the other person to "engage in."  The presence of "conduct" and the absence of other critical terms—such as "conviction," "offense," and "crime of violence"—show that § 373 focuses on the actual defendant's charged conduct (not a hypothetical defendant's imagined conduct).  The § 373 question before us is a legal one of the correct statutory interpretation of the text in § 373.[3] This is not a close call given § 373's plain text.

To give meaning to the "conduct" text in § 373, I conclude that the § 373 text compels this two-step inquiry: (1)  what "conduct" did the defendant Gillis solicit another person "to engage in"; and (2) then a determination of whether that actual, solicited "conduct" constitutes "a felony that has as an element the use, attempted use, or threatened use of force."  This is not a case where the statute requires us to determine if "a conviction" or "an offense" is "a felony" that satisfies the elements clause.  Rather § 373's threshold inquiry is whether the

construction is to be drawn by reason of the chapter in Title 18, Crimes and Criminal Procedure, as set out in section 1 of this Act, in which any particular section is placed, nor by reason of the catchlines used in such title." (emphasis added)).  Because § 373 is in Title 18, we cannot use the title of § 373 in our statutory construction of § 373's text.

[3]There is no residual clause in § 373, and this case involves no constitutional claim.

defendant solicited another person to "engage in conduct constituting" a felony that satisfies the elements clause.[4]

## B.   § 373's "Conduct" Text Is Best Read as Gillis's Conduct, Not an Imagined Defendant's

In the threshold inquiry as to what "conduct" defendant Gillis solicited another person "to engage in," let's start with the § 373 count in the indictment, given the jury convicted Gillis of that charged conduct.  The § 373 count explicitly charged that the "conduct" Gillis solicited another person to "engage in" was kidnapping by (1) "seizing, confining, kidnapping, abducting, and carrying away" the victim, and (2) holding that victim, in violation of § 1201(a).  That charged conduct is literally five of the statutory terms listed in the § 1201(a) kidnapping statute, which provides:

> Whoever unlawfully <u>seizes, confines</u>, inveigles, decoys, <u>kidnaps, abducts, or carries away</u> and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof . . . shall be punished by imprisonment for any term of years or for life . . . .

---

[4]It is also noteworthy that § 924(c)(1)(A) refers to a "crime of violence" and then § 924(c)(3) defines "crime of violence" as "an offense that <u>is</u> a felony"; whereas, § 373 refers to "engage in conduct <u>constituting</u> a felony."  To constitute means to "compose, comprise, form [or] make up."  See <u>Constitute</u>, Merriam-Webster Unabridged, http://unabridged.merriam-webster.com/unabridged/constitute (last visited Aug. 15, 2019).  That the conduct must "constitute" a felony further suggests that a threshold inquiry as to the specific conduct the defendant solicited is needed to determine whether that conduct makes up or comprises a felony that satisfies the force element.

18 U.S.C. § 1201(a) (emphasis added). While § 1201(a) sets forth seven alternative types of kidnapping conduct that establish the first element of the crime, the § 373 count charged Gillis with soliciting five of them: seizing, confining, kidnapping, abducting, and carrying away the victim.[5]

Importantly though, in Gillis's case, both the indictment and jury instructions did not charge or include the two statutory terms of "inveigles" and "decoys." In the district court, even Gillis agreed those two statutory alternatives—"inveigles" and "decoys"—should not be used in the jury charge, as he was not charged with that type of kidnapping conduct.[6] In his brief on appeal, Gillis also does not ask this Court to examine the "inveigles" or "decoys" conduct in § 1201(a).

Yet the majority, at the outset of its § 373 analysis, (1) mistakenly examines only the statutory terms of "inveigles" and "decoys" and (2) then analyzes only whether kidnapping by "inveigles" or "decoys" constitutes "a felony" that qualifies under § 373's force clause. The majority's legal error in departing from § 373's

---

[5]As the majority opinion correctly states, the two elements of a § 1201(a) kidnapping are: (1) unlawfully seizing, confining, inveigling, decoying, kidnapping, abducting, or carrying away the victim; and (2) holding the victim for ransom, reward, or other benefit. See Maj. Op. at 39.

[6]The omission of "inveigles" and "decoys" was intentional, not accidental. Gillis initially objected to the proposed kidnapping jury instruction because it listed only some of the statutory alternatives—"kidnap, seize, confine, abduct, or carry away"—and omitted other forms of kidnapping in the § 1201(a) statute ("inveigles" and "decoys"). At trial, the district court explained that the jury instruction matched the forms of kidnapping charged in the indictment, but asked, "So do you want me to add the words that they haven't charged in their Indictment?" Gillis's counsel initially replied that he did, but then withdrew his request.

62

text causes a misguided focus on only "inveigles" and "decoys" and a hypothetical defendant's imagined conduct under an ordinary-case interpretation.

In doing so, the majority improperly treats the "engage in conduct" language in the § 373 solicitation statute as mere surplusage and effectively reads it out of that statute. See, e.g., Corley v. United States, 556 U.S. 303, 314, 129 S. Ct. 1558, 1566 (2009) ("[O]ne of the most basic interpretive canons [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."); Garcia v. Vanguard Car Rental USA, Inc., 540 F.3d 1242, 1247 (11th Cir. 2008) (stating that under the canon against surplusage, "we strive to give effect to every word and provision in a statute when possible"); see also Henson v. Santander Consumer USA, Inc., 582 U.S. __, __, 137 S. Ct 1718, 1725 (2017) ("Legislation is, after all, the art of compromise, the limitations expressed in statutory terms often the price of passage[.]"); Nielsen v. Preap, 586 U.S. __, __, 139 S. Ct. 954, 969 (2019) (plurality opinion of Alito, J.) (noting that under the canon against surplusage, "every word and every provision [of a statute] is to be given effect" and none "should needlessly be given an interpretation that causes it . . . to have no consequence").

As discussed later, both Gillis and the government, unlike the majority, start their own analysis with the "conduct" that Gillis actually solicited. To be sure,

63

Gillis and the government disagree about where to find what "conduct" Gillis actually solicited. Gillis looks to only the specific type of kidnapping conduct charged in the indictment. The government says "conduct" is the violent kidnapping conduct shown in the trial evidence. But my point here is only that even Gillis does not ask this Court to look to imagined conduct that was never charged against him. Given § 373's conduct-based text, Gillis rightly ignores "inveigles" and "decoys" in the § 1201(a) statute, and we must too.[7]

In short, the majority's error is at its first step—that is, construing the plain "engage in conduct" language of § 373 to mean a hypothetical defendant's imagined conduct during an ordinary-case. In my view, the text of § 373 is best read to focus on the "conduct" that the defendant actually solicited another person "to engage in."

## C.    Majority's Reasons for Its Statutory Interpretation

So, why does the majority ignore § 373's "conduct" text and read § 373 in such an unnatural way? The majority gives several reasons.

First, the majority believes it must follow United States v. McGuire, 706 F.3d 1337 (11th Cir. 2013), as a result of our Court's well-established prior panel

---

[7]In his brief, Gillis notes that although § 1201(a) also includes "inveigles" and "decoys" as methods of kidnapping, "neither of those verbs were charged in the superseding indictment or charged to the jury." Though Gillis does not say so explicitly, it appears that this is the reason he focuses on kidnapping by "confining" the victim, as charged in the indictment, as opposed to these other two statutory forms of kidnapping.

64

precedent rule. That rule "obligates us to follow the holdings of an earlier decision, but the holdings of a prior decision can reach only as far as the facts and circumstances presented to the court in the case which produced that decision." Anders v. Hometown Mortg. Servs., Inc., 346 F.3d 1024, 1031 (11th Cir. 2003); see also Edwards v. Prime, Inc., 602 F.3d 1276, 1298 (11th Cir. 2010) ("We have pointed out many times that regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case.").

Because McGuire interpreted § 924(c), its holding—that whether a "crime of violence" is an "offense that is a felony" as defined by an elements clause requires a categorical approach—is binding on subsequent panels only in § 924(c) cases. See United States v. Fulford, 662 F.3d 1174, 1178-79 (11th Cir. 2011) (concluding this Court was not bound by prior precedent interpreting the definition of the term "minor" found in other provisions of the Sentencing Guidelines).

What the majority opinion is really doing here is extending the reasoning of McGuire to another statute, § 373(a), which has a materially different text. Although an elements clause follows the word "felony," the § 373 text first refers to solicitation of another person to "engage in conduct constituting a felony." In contrast, § 924(c) refers to "a crime of violence" defined as "an offense that is a felony." The majority's extension of McGuire to the § 373 text is not something the prior panel precedent rule obligates us to do. See Anders, 346 F.3d at 1031

65

(explaining, under the prior panel precedent rule, the Court is "not obligated to extend the decision to different situations"); Dantzler v. IRS, 183 F.3d 1247, 1251 (11th Cir. 1999) ("[T]here is a big difference between following a precedent where the prior-precedent rule demands it and extending a precedent.").  As outlined above, I am not persuaded that the text of § 373(a) means a hypothetical defendant's imagined conduct.

Second, the majority relies on United States v. Davis, 588 U.S. __, 139 S. Ct. 2319 (2019).  If anything, Davis further persuades me that the § 373 "conduct" text is different in critical ways from the "offense"-based text in § 924(c)(3) addressed in McGuire.  To be sure, while Davis's holding is about the residual clause, the key text in § 924(c) on which the Davis majority focused was the word "offense," which came before both the residual and elements clauses. See id. at __, 139 S. Ct. at 2327-29.  In Davis, the Supreme Court reasoned that the word "offense" can carry at least two possible meanings: "It can refer to a generic crime, say the crime of fraud or theft in general, or it can refer to the specific acts in which an offender engaged on a specific occasion."  Id. at 2328.

Here, however, the § 373 statute does not use the word "offense."  Rather, § 373's text—"conduct" that Gillis solicited another person "to engage in"—has only one plausible meaning or interpretation: the specific conduct that Gillis solicited.  How the Davis 5-4 decision struggled mightily with even the word

66

"offense" suggests Gillis's case is more easily decided because of both the presence of the "conduct" text in the § 373 statute and the absence of the terms "offense," "conviction," or "crime of violence" before the elements clause.[8]  Davis does not demand as much of us as the majority contends.

Third, the majority points out that the Supreme Court has told us that the ordinary-case, categorical approach applies to the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e).  But the ACCA refers to "convictions," not "conduct."[9]  See Johnson v. United States, 576 U.S. __, __, 135 S. Ct. 2551, 2562 (2015) ("The relevant part of the [ACCA] refers to 'a person who . . . has three previous convictions' for—not a person who has committed—three previous violent felonies or drug offenses."); see also Sessions v. Dimaya, 584 U.S. __, __, 138 S. Ct. 1204, 1217 (2018) ("Our decisions have consistently understood language in the residual clauses of both ACCA and § 16 to refer to the statute of conviction, not to the facts of each defendant's conduct."); Mathis v. United States,

---

[8]As the dissent in Davis points out, even the term "'offense' was read in Hayes, Kawashima, and Nijhawan to encompass both the legal prohibition and the defendant's conduct," and that "offense" in § 924(c)(3) "should be read that same way."  Davis, 588 U.S. at __, 139 S. Ct. at 2347 (Kavanaugh, J., dissenting) (emphasis added).  Here, § 373 explicitly refers to "conduct," a critical term in the required statutory interpretation of § 373.

[9]Section 16(b) uses the word "offense," rather than "conviction," but the Supreme Court interpreted "offense" to indicate essentially the same thing as "conviction" in this context.  See Sessions v. Dimaya, 584 U.S. __, __, 138 S. Ct. 1204, 1217 (2018).

67

579 U.S. __, __, 136 S. Ct. 2243, 2252 (2016) (pointing out that the "ACCA refers to predicate offenses in terms not of prior conduct but of prior 'convictions'").[10]

Fourth, the majority reasons that it must analyze "inveigles" and "decoys" because (1) § 1201(a) sets forth alternative means of committing kidnapping, rather than alternative elements defining separate kidnapping crimes, and (2) § 1201(a) is thus not divisible under Mathis. See Maj. Op. at 39-43.[11]

Tellingly though, Mathis, like Johnson, involved the ACCA, which refers to "convictions," not "conduct." See Mathis, 579 U.S. at __, 136 S. Ct. at 2248. In that context, the Mathis Court explained, determining whether a prior conviction categorically qualifies as an ACCA predicate offense requires courts to "focus solely on whether the elements of the crime of conviction sufficiently match the elements" of the relevant ACCA predicate (Iowa burglary in Mathis). Id. Thus, "[d]istinguishing between elements and facts is . . . central to ACCA's operation." Id. It was only against the ACCA's prior conviction backdrop that the Mathis Court concluded courts may not, in a case involving an indivisible statute, use the

---

[10]In addition, neither of the two reasons about past convictions identified in Johnson and Dimaya apply to § 373. Undisputedly, § 373 operates in the present, and Gillis was convicted by a jury, obviating any Sixth Amendment or Shepard concerns. See Shepard v. United States, 544 U.S. 13, 24-26, 125 S. Ct. 1254, 1262-63 (2005).

[11]The majority opinion explains, relying in part on Mathis, that a statute that sets out various different means of satisfying a particular element is not divisible, and therefore is not subject to the modified categorical approach, which permits courts to look beyond the statutory text to determine what version of the crime a defendant was convicted of. See Maj. Op. at 39-40.

modified categorical approach to determine how a given defendant actually perpetrated the crime that resulted in the prior conviction.  See id. at __, 136 S. Ct. at 2251-54.  Even Mathis itself points out that the "ACCA refers to predicate offenses in terms not of prior conduct but of prior 'convictions.'"  Id. at __, 136 S. Ct. at 2252.

Unlike the "conviction" text in the ACCA's § 924(e), the text that matters here is § 373, which directs courts to consider not prior "convictions" or "offenses," but the "conduct" Gillis solicited another person to "engage in." Because of this "conduct" language, the § 373 text requires us to determine what type of kidnapping conduct Gillis was charged with, and convicted of, soliciting.

Fifth, the majority reasons that there is "little difference" between § 373's use of the phrase "engage in conduct constituting a felony" and the use of the phrase "crime of violence," defined as "an offense that is a felony" in § 924(c) and § 16.  Maj. Op. at 34.  Yet, the majority's statutory interpretation ignores the presumption of consistent usage, which "instructs that '[a] word or phrase is presumed to bear the same meaning throughout a text' and that 'a material variation in terms suggests a variation in meaning.'"  In re Failla, 838 F.3d 1170, 1176-77 (11th Cir. 2016) (quoting Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 170 (2012)).  These three statutes are within the same Comprehensive Crime Control Act ("CCCA"), but Congress chose to use

69

different language in § 373.[12]  Under this interpretive canon, these material

variations in § 373's terms indicate that Congress intended a different meaning for

the federal solicitation crime.

One more related observation.  While the text controls, the legislative history

of § 373 also does not support the majority's conclusion.  As originally proposed,

§ 373, like § 924(c), would have directly relied on § 16's crime of violence

definition.[13]  In the original draft of the CCCA, § 373 proscribed the solicitation of

"another person [to] engage in conduct constituting a crime of violence"  H.R.

Doc. No. 98-32, at 319 (1983) (emphasis added) (setting out the proposed text of

§ 373).  For purposes of the proposed § 373, the term "crime of violence" was to

be defined in a new section 16 (also added to title 18) that had both residual and

elements clauses.  Id., at 596.

Notably, however, § 373, unlike § 924(c), was amended during the drafting

process, and § 373 as enacted no longer relied on § 16's definition of "crime of

violence," and did not include the terms "crime of violence" or "offense" in its

statutory text.  See Comprehensive Crime Control Act of 1984, Pub. L. No. 98-

---

[12]See Rusello v. U.S., 464 U.S. 16, 23, 104 S. Ct. 296, 200 (1983) (declining to read a term appearing in two subsections of a statute to have the same meaning where there is "differing language" in the subsections, explaining that if Congress had intended the two subsections to have the same meaning, it would have written the statute that way).

[13]As the majority correctly notes, in the CCCA, § 924(c) did not contain its own definition of "crime of violence," instead relying on the definition in § 16.  See Maj. Op. at 33 n.12.

70

473, § 1003(a), 98 Stat. 2138 (1984). Instead, the final, enacted version of § 373 proscribed only, in relevant part, solicitation of "another person [to] engage in conduct constituting a felony." Id. The fact that Congress rejected the original, proposed version of § 373, which would have incorporated § 16's "crime of violence" and "offense" terminology and definition wholesale, is another indication that Congress intended § 373 to be construed differently from § 924(c) and § 16. It cannot be that § 373's "conduct" text makes no difference whatsoever, as the majority concludes.

So far, I have covered only the required statutory interpretation of § 373 and the majority's legal error in its statutory interpretation. Given § 373's "conduct" text, I now examine: (1) the "conduct" Gillis solicited another person to "engage in"; and (2) then whether that solicited "conduct" constitutes a felony that satisfies § 373's force clause.

### III. STEP ONE: WHAT CONDUCT DID GILLIS SOLICIT?

The correct statutory interpretation is easier than the issue of where do we look to find Gillis's "conduct" to give meaning to "conduct" in the § 373 text.

In the first step, the government argues that we should look at the real-world facts showing the actual conduct Gillis solicited. The content of Gillis's solicitation was by email and thus not disputed. As the majority recounts, Gillis solicited Agent Hyre to help him "snag" his coworker M.O. and "use her a[s] a sex

71

slave." Specifically, Gillis asked Agent Hyre to recruit other "experienced" individuals to help them kidnap M.O., telling Agent Hyre that they would need a van and a place to keep M.O. for at least 24 hours, suggesting that they should hood or blindfold M.O. and wear masks themselves, and indicating that he did not care what happened to M.O. after they were done with her. The government argues that the relevant, actual conduct here is the solicitation of a violent abduction and kidnapping.

On the other hand, Gillis identifies and limits his convicted conduct to kidnapping by "seizing, confining, kidnapping, abducting, and carrying away" the victim, given that is the only conduct charged in the indictment and jury instructions. As to that conduct, Gillis argues (1) that the least culpable conduct of that charged in the indictment is kidnapping by "confining" the victim, and (2) that "confining" does not necessarily and categorically satisfy § 373's force clause.

The resolution of this particular case does not require a choice between: (1) the government's deep dive into the trial evidence about the actual, violent kidnapping of his coworker that Gillis solicited; or (2) Gillis's focus on solely the kidnapping conduct of "confining" the victim as charged in the indictment. That is

72

because, as explained below, even the kidnapping conduct of "confining" the victim categorically satisfies § 373's force clause.[14]  I explain why.

## IV. STEP TWO: PHYSICAL FORCE CLAUSE

In step two, and accepting Gillis's focus on the least culpable conduct charged in the indictment, the inquiry is does the kidnapping Gillis solicited—kidnapping by confining the victim—constitute "a felony that has as an element the use, attempted use, or threatened use or physical force."  18 U.S.C. § 373(a).  Like the majority, I review the Supreme Court's physical-force decisions.

### A.    Physical Force Requirement

In Curtis Johnson, the Supreme Court instructed that "physical" refers to "force exerted by and through concrete bodies," as opposed to "intellectual force or emotional force."  Curtis Johnson v. United States, 559 U.S. 133, 138, 130 S. Ct. 1265, 1270 (2010).  The Supreme Court determined that "in the context of a statutory definition of 'violent felony,' the phrase 'physical force' means violent force—that is, force capable of causing physical pain or injury to another person."  Id. at 140, 130 S. Ct. at 1271.  In Castleman, the Supreme Court reiterated that

---

[14]As an aside, the jury charge used "or" and stated that the government must prove Gillis solicited a kidnapping by "kidnapp[ing], seiz[ing], confin[ing], abduct[ing], or carry[ing] away," although the indictment used "and" between the statutory terms. (emphasis added).  While the jury found Gillis guilty of the § 373 count, it was a general verdict that did not identify which of these five types of kidnapping conduct Gillis solicited.  This is another reason why I will assume that the least culpable conduct in the indictment, that Gillis was convicted of soliciting, is kidnapping by "confining," as Gillis argues.

"physical force" in 18 U.S.C. § 921(a)(33)(A)(ii) simply denotes force that is exerted by and through concrete bodies, as opposed to intellectual or emotional force, and that it encompasses both indirect and direct uses of force.  United States v. Castleman, 572 U.S. 157, 170-71, 134 S. Ct. 1405, 1414-15 (2014).  The Supreme Court explained that, for example, the "use of force" in a poisoning case is not the act of sprinkling the poison, but rather is "the act of employing poison knowingly as a device to cause physical harm."  Id. at 171, 134 S. Ct. at 1415.  "That the harm occurs indirectly, rather than directly (as with a kick or punch), does not matter."  Id.

Then, in Stokeling, the Supreme Court re-examined the meaning of "physical force," defined as "force capable of causing physical pain or injury."  Stokeling v. United States, 586 U.S. __, __, 139 S. Ct. 544, 553 (2019).  The Supreme Court rejected Stokeling's argument that a heightened force requirement—"force that is reasonably expected to cause pain or injury"—should apply in the ACCA context.  Id. at __, 139 S. Ct. 554.  The Supreme Court explained that it had declined to adopt such a standard in Curtis Johnson and instead "settled on force capable of causing physical pain or injury."  Id.  And the term capable "does not require any particular degree of likelihood or probability that the force used will cause physical pain or injury; only potentiality."  Id.  The Supreme Court elaborated that the term "physical force" includes force that could

74

"lead[] to relatively minor forms of injury," including "hitting, slapping, shoving, grabbing, pinching, biting, and hair pulling." Id.[15]

In sum, these Supreme Court decisions instruct that "physical force" in the elements clause context means: (1) an act that is physical, in that it must be "exerted by and through concrete bodies," not "intellectual force or emotional force"; (2) a physical act that is directly or indirectly "capable of causing physical pain and injury"; and (3) "capable" means that the force "potentially" will cause physical pain or injury, not that it is "reasonably likely" to do so.

## B.    Kidnapping by Unlawful "Confining" Satisfies § 373's Force Clause

The final § 373 question is whether Gillis's kidnapping conduct— "unlawfully confining" the victim—necessarily and categorically involves the use, attempted use, or threatened use of physical force.

The government relies on United States v. Salemi, 26 F.3d 1084, 1086-87 (11th Cir. 1994), where the government appealed Salemi's sentence, which was reduced due to his mental illness. Vacating Salemi's sentence, we held that the Sentencing Guidelines provided that mental conditions should not be considered

---

[15]The majority in Stokeling also rejected the defendant's argument, echoed by the dissenters in that case, that "physical force," as defined by the Curtis Johnson Court, meant a "strong," "substantial" or "heightened" degree of force. See Stokeling, 586 U.S. at __, 139 S. Ct. at 553 (rejecting Stokeling's argument that Curtis Johnson held that physical force means "substantial force" or force that is "severe," "extreme," "furious," or "vehement"); id. at __, 139 S. Ct. at 557-58 (Sotomayor, J., dissenting) (arguing that Curtis Johnson interpreted "physical force" to mean a "strong" or "substantial degree of force").

when a defendant commits a crime of violence, and Salemi's § 1201(a) kidnapping conviction qualified as a crime of violence under the elements clause in U.S.S.G. § 4B1.2.  See id. at 1087-88.  This Court explained that the Commentary to § 4B1.2 expressly listed kidnapping as a crime of violence, and the Commission had "recognized that kidnapping inherently involves the threat of violence."  Id. at 1087.  Because Salemi was based on authoritative Guidelines commentary, it does not answer the § 373 question here.[16]

Nevertheless, the ordinary meanings of the terms "unlawfully" and "confining," used in the § 1201(a) kidnapping statute, help provide the answer. "Courts must assume that Congress intended the ordinary meaning of the words used, and absent a clearly expressed legislative intent to the contrary, that language is generally dispositive."  Arcia v. Florida Sec'y of State, 772 F.3d 1335, 1344 (11th Cir. 2014).

The Oxford English Dictionary defines "confine" as "[t]o shut up, imprison, immure, put or keep in detention," "[t]o enclose or retain within limits; to fasten, secure, keep in place," and "[t]o keep within bounds, limit, restrict."  Confine,

---

[16]See In re Burgest, 829 F.3d 1285, 1287 (11th Cir. 2016) (holding defendant's prior Florida conviction for kidnapping is categorically a crime of violence under the Guidelines, citing the commentary to § 4B1.2).  After Salemi and In re Burgest, the Commission revised § 4B1.2 itself to explicitly enumerate that kidnapping is a crime of violence.  See U.S.S.G. § 4B1.2(a)(2) (2016) (defining crime of violence in part as an offense under state or federal law, punishable by an imprisonment term exceeding one year, that "is . . . kidnapping").

OED Online, http://www.oed.com/view/Entry/38837?result=4&rskey=CRLpAy& (last visited Aug. 14, 2019).  Similarly, Merriam-Webster's Unabridged Dictionary defines "confine" as "to hold within bounds: restrain from exceeding boundaries," "to keep in narrow quarters: imprison," and "to keep to a certain place or to a limited area."  Confine, Merriam-Webster Unabridged, http://unabridged.merriam-webster.com/unabridged/confine (last visited Aug. 14, 2019).

Let's not forget that only "unlawfully" confining the victim suffices for a § 1201(a) kidnapping.  Black's Law Dictionary defines "unlawful" as "[n]ot authorized by law; illegal," "[c]riminally punishable," and "[i]nvolving moral turpitude."  Unlawful, Black's Law Dictionary (11th ed. 2019).  Likewise, the Oxford English Dictionary defines "unlawful" as "[c]ontrary to or prohibited by law; not conforming to, permitted by, or recognized by law; illegal; unjust, wrongful," "[c]ontrary to or prohibited by moral standards or religious precepts; immoral, unethical; wicked, sinful," and "not obeying the law; acting illegally or without legal authority; without legal standing."  Unlawful, OED Online, http://www.oed.com/view/Entry/215008?redirectedFrom=unlawful#eid (last visited Aug. 14, 2019).

These definitions of "confine" all involve a physical act of some sort, whether it is shutting up, detaining, or imprisoning a victim, or merely keeping the victim within bounds or in a limited area.  See Curtis Johnson, 559 U.S. at 138-39,

77

130 S. Ct. at 1270.  Such confinement must also be wrongful and illegal, and thus against the victim's will.  To accomplish such confinement, the kidnapping necessarily requires some use or threat of physical force against the victim's person in order to secure the wrongful or illegal detention, imprisonment, or confinement, while the kidnapper seeks ransom, reward, or some other benefit.

That fact is supported by the pattern jury instructions.  As the government emphasizes, the pattern jury instructions, given as to all forms of kidnapping charged in this case, provided: "To 'kidnap' a person means to <u>forcibly</u> and unlawfully hold, keep, detain, and confine that person against the person's will. Involuntariness or coercion related to taking and keeping the victim is an essential part of the crime." (emphasis added).

On balance, I am convinced by the government's argument that kidnapping by "unlawfully confining" the victim is an active, intentional, violent crime (1) that causes a serious interference with the freedom and movement of the victim against his or her will, (2) that also necessarily involves a protracted, not merely momentary, period of such confinement while the kidnapper seeks ransom, reward, or other benefit, and (3) that inherently implies a threat of force if the victim tries to escape.  See United States v. Patino, 962 F.2d 263, 267 (2d Cir. 1992) (citing the elements clause in § 924(c)(3) and stating, albeit without any analysis, "That the crime of kidnapping involves the threatened use of physical force against a person

and is thus a crime of violence under this statute cannot be questioned.").[17]

Because kidnapping by unlawfully confining a victim inherently involves at least the threat of violence, it satisfies § 373's force clause.[18]

I recognize that Gillis contends that kidnapping by confinement is shown where a defendant lures a victim into a room and locks the door without using physical force against the victim's person. Gillis argues this is a plausible example of confinement by non-physical means or at least by physical acts not capable of causing pain or injury. Yet I am unable to locate any successful kidnapping prosecutions in this circuit for merely locking a door to a room. Nor have the parties cited one. Gillis's hypothetical ignores that the Supreme Court and this

---

[17]The majority opinion cites the Seventh Circuit's decision in Jenkins, which held that § 1201(a) kidnapping did not qualify as a crime of violence under § 924(c)(3). United States v. Jenkins, 849 F.3d 390, 394 (7th Cir. 2017), vacated and remanded, 138 S. Ct 1980 (2018). However, Jenkins does not address the first element of "unlawfully confining" the victim, but discusses only "holding for ransom or reward or otherwise." See id. at 393. The government in Jenkins rested its force argument on only the second element of § 1201(a) kidnapping: "holding for ransom or reward or otherwise." Id. (alteration omitted). Thus, the Seventh Circuit concluded only that § 1201(a) "[h]olding can be accomplished without physical force," and made no ruling as to whether "unlawfully confining" inherently involves a threat of force. Id.

[18]The kidnapping decisions discussed by the majority involve "inveigles" or "decoys" or discuss the second element of "hold" for ransom or reward. See, e.g., United States v. Boone, 959 F.2d 1550, 1555-57 (11th Cir. 1992) (inveiglement and/or decoy); United States v. McInnis, 601 F.2d 1319, 1321, 1323-26 (5th Cir. 1979) (same); see also Chatwin v. United States, 326 U.S. 455, 459-61, 66 S. Ct. 233, 235-36 (1946) (concluding there was no evidence the defendant "held" the victim against her will where the defendant had "inveigled" or "decoyed" the victim from the custody of state juvenile court authorities); Jenkins, 849 F.3d at 393 ("holding" element can be accomplished without physical force); United States v. Lentz, 383 F.3d 191, 200 (4th Cir. 2004) (inveigled the victim to cross state lines).

None of these decisions involves kidnapping by unlawfully "confining" the victim, and thus I do not discuss them.

79

Court have cautioned against the use of "legal imagination" to devise highly improbable ways to commit a crime that would render it non-forceful.  See Moncrieffe v. Holder, 569 U.S. 184, 191, 133 S. Ct. 1678, 1684-85 (2013); United States v. Vail-Bailon, 868 F.3d 1293, 1306-07 (11th Cir. 2017) (en banc).[19]

## V. CONCLUSION

For these reasons, I would affirm Gillis's § 373 solicitation conviction and thus respectfully dissent from Section V.  I fully concur in Sections I through IV.

---

[19]Indeed, the real-world examples of kidnapping in this Circuit unquestionably involve uses of force capable of causing physical pain and injury to the victim.  See, e.g., United States v. Lewis, 115 F.3d 1531, 1533 (11th Cir. 1997) (defendant "kidnapped" victim by beating her into unconsciousness before placing her in his car and driving across state lines); United States v. Adams, 83 F.3d 1371, 1372 (11th Cir. 1996) (husband "kidnapped" wife by attempting to force her into his car, then shooting her when she broke free); United States v. Pinion, 4 F.3d 941, 942 (11th Cir. 1993) (defendant "abducted" 12-year-old victim at gunpoint and held her for days, sometimes physically restraining her or threatening her with the handgun); United States v. Duncan, 855 F.2d 1528, 1529 (11th Cir. 1988) (defendant "abducted" victim by grabbing her at knifepoint and forcing her to drive away with him in her car).

The majority opinion also suggests a hypothetical kidnapping of an infant by a grandparent.  But the kidnapping statute expressly excludes parental kidnapping by a non-custodial parent, 18 U.S.C. § 1201(a), and this grandparent hypothetical is an improbable prosecution too.  I have located no grandparent prosecutions for federal kidnapping in such circumstances, nor do the parties or the majority cite any.